## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel.<br>BRENDA SHARP, | ) <br>) <br>) | |
| Plaintiff, | ) <br>) | |
| v. | ) <br>) | Case No. 05-CV-572-TCK-TLW |
| EASTERN OKLAHOMA ORTHOPEDIC<br>CENTER, | ) <br>) <br>) | |
| Defendant. | ) <br>) | |

## OPINION AND ORDER

Before the Court is Defendant Eastern Oklahoma Orthopedic Center's Motion to Dismiss the First Amended Complaint (Doc. 43), wherein Defendant Eastern Oklahoma Orthopedic Center ("EOOC") moves the Court to dismiss this action with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b).[1]  For reasons explained below, Defendant's motion (Doc. 43) is granted in part and denied in part.

### I.    Factual Background

Brenda Sharp ("Relator") filed this qui tam action on behalf of the United States of America pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*[2]  The following facts are

---

[1]  Rule 12(b)(1) is not expressly referenced in EOOC's motion.  However, EOOC argues that the suit is jurisdictionally barred pursuant to 31 U.S.C. § 3730(e)(4)(A), thereby invoking the legal standards governing Rule 12(b)(1) motions.

[2]  The FCA authorizes private citizens to assert FCA claims on behalf of the United States. 31 U.S.C. § 3730(b). These actions are known as qui tam actions, with the private citizen or "relator" acting "for the person and for the U.S. government against the alleged false claimant." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 706 n.3 (10th Cir. 2006) (quotation omitted).  A relator in a qui tam action receives a certain percentage of any amount recovered by the United States, depending on the circumstances of each case. *See* 31 U.S.C. § 3730(d).

alleged in Relator's First Amended Complaint ("FAC").  Relator is a former employee of EOOC, which is an Oklahoma corporation that provides medical  services to patients, some of whom are covered by Medicare and Medicaid.  Relator was employed as the Front Desk Supervisor, and her duties included day-to-day scheduling, maintaining demographics of patients, checking patients in and out, cashiering, and supervising other employees.  In addition to these duties, Relator was "occasionally asked insurance questions presented by patients and researched accounts to discuss payments received and/or accounts awaiting payment." (FAC ¶ 12.)  In the course of performing these duties, Relator alleges to have witnessed numerous practices by EOOC that constitute violations of the FCA.  On October 5, 2004, Relator informed EOOC of her belief that it was submitting fraudulent claims to Medicare and Medicaid.  After this meeting, EOOC's agents began a "pattern of discrimination and retaliation" against Relator.  On May 13, 2005, Relator was terminated.

Based on these facts, Relator asserts five causes of action:  (1) presentation of false claims to the government, in violation of 31 U.S.C. § 3729(a)(1); (2) making or using a false record or statement to get a false claim paid or approved by the government, in violation of 31 U.S.C. § 3729(a)(2); (3) making or using a false record or statement to conceal, avoid, or decrease an obligation to pay the government, in violation of 31 U.S.C. § 3729(a)(7); (4) violating Medicare's

anti-kickback" provision, which is set forth at 42 U.S.C. § 1320a-7b(b);[3] and (5) retaliatory

discharge, in violation of 31 U.S.C. § 3730(h).[4]

On March 21, 2008, the United States notified the Court that it would not intervene in the

action.  *See* 31 U.S.C. § 3730(b)(2) (providing that United States must be given opportunity to

intervene before relators may serve complaint on defendant).  On July 8, 2008, EOOC filed its

Motion to Dismiss the First Amended Complaint, which is currently pending before the Court.[5]

Pursuant to an unopposed motion by EOOC, the Court struck its order for a Joint Status Report and

delayed entering a scheduling order pending the outcome of EOOC's motion to dismiss.  (*See* Doc.

40.)

## II.    Subject Matter Jurisdiction

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally take one

of two forms: a facial attack on the complaint's allegations as to the existence of subject matter

jurisdiction or a factual attack based on evidence outside the pleadings.  *Stuart v. Colo. Interstate

Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). In this case, EOOC has made a facial attack on the

FAC, arguing that the Court lacks subject matter jurisdiction over Relator's FCA claims because she

---

[3] In her fourth cause of action, Relator also references the "Stark law," which is a provision that prohibits certain physician referrals.  *See* 42 U.S.C. § 1395nn(a).  Relator does not mention this provision in her response brief, and her reliance on this theory appears to be abandoned.  Further, the alleged facts in the fourth cause of action do not involve "referrals" but instead involve waivers by EOOC of patients' co-insurance and deductibles.  Accordingly, the Stark law is inapplicable, and any claims arising thereunder are dismissed.

[4] Relator voluntarily dismissed her state law claims, which comprised the fifth, sixth, seventh, and eighth causes of action in the FAC.  (*See* Resp. to Def.'s Mot. to Dismiss 37-38.)

[5] On August 18, 2008 and October 9, 2008, EOOC filed a corrected exhibit and supplemental authority in support of its motion.

3

is not an "original source" of the information forming the basis of her claims and cannot satisfy the jurisdictional requirements of 31 U.S.C. § 3730(e)(4)(A). Therefore, the Court "must accept the allegations in the complaint as true" and determine whether the jurisdictional requirements for FCA claims are satisfied. *Id.*

Federal courts lack subject matter jurisdiction over FCA claims that are based on information derived from specific types of public hearings, publications, or investigations, unless the person bringing the FCA claim was an "original source" of that information:

> (e) Certain actions barred.
> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions *in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media,* unless . . . the person bringing the action is an original source of the information.
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A),(B) (emphasis added). This jurisdictional scheme seeks "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995) (internal quotation omitted). The goal is to bar suits which the government is capable of pursuing itself and to promote suits which the government is not equipped to bring on its own. *Id*.

The Tenth Circuit has proscribed a four-part jurisdictional inquiry: "(1) whether the alleged 'public disclosure' contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made 'public' within the meaning of the False Claims Act; (3) whether the relator's complaint is 'based upon' this 'public disclosure'; and, if so, (4) whether the

4

relator qualifies as an 'original source' under section 3730(e)(4)(B)." *United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1161 (10th Cir. 1999); *United States ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000, 1004 (10th Cir. 1996). "A court must address the purported public disclosure before analyzing whether the relator is an original source." *Advanced Sciences*, 99 F.3d at 1004. "If the answer to any of the first three questions is 'no,' the inquiry is complete and section 3730(e)(4) does not bar the relator's complaint." *Id.*

EOOC argues that Relator's allegations fail because she is not an "original source" of the information on which the allegations are based. However, it is not necessary to reach that question because the answer to the first component of the jurisdictional inquiry – whether the alleged public disclosure contains allegations or transactions from one of the listed sources – is "no." As to this first inquiry, "the allegations of fraud or fraudulent transactions must be contained in one of the forms, or be available from one of the sources, listed in section 3730(e)(4)(A)." *See id.* In this case, the allegations of fraud are not contained in or available from one of the sources listed in the statute – namely, "a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." 31 U.S.C. § 3730(e)(4)(A). Indeed, neither party has identified any public proceedings, hearings, investigations, or media reports that are relevant to this case. Instead, Realtor's allegations of fraud are based solely on information obtained by her while employed by EOOC, and Relator is not seeking to capitalize on information that has already been the subject of a public hearing or report. Therefore, the jurisdictional statute is not triggered, and there is no need to conduct further inquiry. *See id.* at 1005 (holding that a memorandum forming the basis of an FCA claim contained

allegations and transactions that were originally set out in a public administrative audit, which "triggered" the jurisdictional bar and required further inquiry).

## III.   Standards of Review

EOOC argues that the FCA claims are subject to dismissal pursuant to Rule 9(b) and Rule 12(b)(6) because (1) the allegations are not pled with the requisite particularity, and/or (2) the allegations, taken as true, fail to state a claim for an FCA violation or retaliatory discharge.

### A.   Rule 12(b)(6)

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief may be granted. The factual allegations within the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1965 (2007) (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969. At this stage of the proceedings, a court must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002).   However, a court need not accept as true those allegations that are conclusory in nature. *Erikson v. Pawnee County Bd. of County Comm'rs*, 263 F.3d 1151, 1154-55 (10th Cir. 2001) (citations omitted); *Hall v. Bellman*, 935 F.2d 1106, 1109-10 (10th Cir. 1991) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based.").

6

B.      Rule 9(b) Applied to FCA Claims

Because FCA claims necessarily involve fraudulent conduct, Rule 9(b)'s heightened pleading

requirements apply.  *See Sikkenga*, 472 F.3d at 727; *United States ex rel. Clausen v. Lab. Corp. of

Am.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002).  Rule 9(b) provides that "in alleging fraud or mistake,

a party must state with particularity the circumstances constituting fraud or mistake," although

"[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Fed. R. Civ. P. 9(b).  A plaintiff must, at a minimum, set forth the "who, what, when, where, and

how of the alleged fraud" as well as the "time, place, and contents of the false representation, the

identity of the party making the false statements and the consequences thereof" in order to comply

with Rule 9(b).  *Sikkenga*, 472 F.3d at 726-27 (internal quotations omitted).

In the specific context of an FCA claim, it is not enough for a relator to provide details

regarding an underlying fraudulent scheme leading to FCA violations.  In order to satisfy Rule 9(b),

such allegations of wrongful activities must be "linked to allegations, stated with particularity, of

the *actual false claims* submitted to the government."  *Sikkenga*, 472 F.3d at 727 (emphasis added)

(quotation omitted); *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 231

(1st Cir. 2004) ("Underlying schemes and other wrongful activities that result in the submission of

fraudulent claims are included in the circumstances constituting fraud and mistake that must be pled

with particularity pursuant to Rule 9(b).  However, such pleadings invariably are inadequate unless

they are linked to allegations, stated with particularity, of the actual false claims submitted to the

government that constitute the essential element of an FCA qui tam action.") (quotation omitted).

Therefore, a relator cannot "'allege simply and without any stated reason for his belief that claims

requesting illegal payments must have been submitted, were likely submitted or should have been

7

submitted.'" *Sikkenga*, 472 F.3d at 727 (quoting *Clausen*, 290 F.3d at 1311).  Instead, Rule 9(b)

requires a relator to provide "'details that identify particular false claims for payment that were

submitted to the government.'" *Sikkenga*, 472 F.3d at 727 (quoting *Karvelas*, 360 F.3d at 232-33).[6]

Thus, in order to meet her burden at the motion to dismiss stage, Relator must allege

sufficient details regarding the underlying fraudulent scheme or practices.  Relator must also allege

at least *some* of the following details for at least some of the false claims submitted as a result of the

wrongful practices:  (1) the dates of the false claims, (2) the content and identification numbers of

the forms or the bills submitted, (3) the fees charged to the government, (4) the goods and services

for which the government was billed, (5) the persons involved in the billing, and (6) the length of

time between the alleged fraudulent practices and the submission of the claims based on those

practices.  *See Sikkenga*, 472 F.3d at 727 (stating that above list is not a "checklist of mandatory

requirements" and that merely "some of this information, for at least some of the claims must be

pleaded in order to satisfy Rule 9(b)").

## IV.   Overview of FCA

As a general matter, "[t]he FCA covers all fraudulent attempts to cause the government to

pay out sums of money."  *United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211,

1217 (10th Cir. 2008) (internal quotation omitted).  Relevant to this case, the FCA prohibits:

---

[6] In the FCA context, heightened pleading rules are designed to discourage relators from "filing allegations of fraud merely in the hopes of conducting embarrassing discovery and forcing settlement."  *United States v. Pfizer, Inc.*, 507 F.3d 720, 733 (1st Cir. 2007); *Karvelas*, 360 F.3d at 231 (stating that a "qui tam relator may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery").  In addition, were courts to allow general pleading at the outset, the United States would be "compelled to decide whether or not to intervene absent complete information about the relator's cause of action."  *Karvelas*, 360 F.3d at 231 (quotation omitted).

(1) knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a *false or fraudulent claim* for payment or approval;

(2) knowingly mak[ing], us[ing], or caus[ing] to be made or used, *a false record or statement to get a false or fraudulent claim paid* or approved by the Government;

. . .

(7) knowingly mak[ing], us[ing], or caus[ing] to be made or used, *a false record or statement to conceal, avoid, or decrease an obligation to pay* or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1),(2), (7) (emphasis added).

A.   Elements

Section 3729(a)(1) prohibits the presentation of false or fraudulent claims to the government for payment. In order to establish a violation of § 3729(a)(1), "a plaintiff must show by a preponderance of the evidence that: (1) a false or fraudulent claim (2) is presented to the United States for payment or approval (3) with knowledge that the claim is false or fraudulent." *United States ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1315 (W.D. Okla. 1998). The "gravamen of a false claim focuses on the conduct of the defendant, and inquires into the defendant's purpose and intention in filing the requests for payment or reimbursement." *Id.*

Section 3729(a)(2) prohibits the making or using of false records or statements in attempt to get a false claim paid by the government. *See Allison Engine Co., Inc. v. United States*, --- U.S.--- , 128 S. Ct. 2123, 2130 (2008) ("What § 3729(a)(2) demands is . . . that the defendant made a false record or statement for the purpose of getting a false or fraudulent claim paid or approved by the Government.") (internal quotation omitted); *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531 (10th Cir. 2000) ("Under § 3729(a)(2), liability is premised on the presentation of a false record or statement to get a false or fraudulent claim paid or approved. Section 3729(a)(1), however, requires only the presentation of a false or fraudulent claim for payment or approval without the additional

9

element of a false record or statement.") (internal quotations omitted). A relator may establish a violation of § 3729(a)(2) by showing: "(1) a false record or statement (2) is used to cause the United States to pay or approve a fraudulent claim (3) with the defendant's knowledge of the falsity of the record or statement." *Trim*, 31 F. Supp. 2d at 1315.

Section 3729(a)(7) prohibits making a false record or statement in attempt to avoid paying the government what it is owed; this type of violation is referred to as a "reverse false claim." *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1194 (10th Cir. 2006) (explaining that § 3729(a)(7) is a reverse false claim provision because the "financial obligation that is the subject of the fraud flowed in the opposite of the usual direction" and because "an individual who makes a material representation in order to avoid paying money [is] equally liable as if he had submitted a false claim to receive money") (internal quotation omitted); *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004) (describing § 3729(a)(7) as the "reverse False Claims Act subsection," and explaining that "[i]n a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated"). The elements of a reverse false claim are: "(1) that the defendant made, used, or caused to be used a record or statement to conceal, avoid, or decrease an obligation to the United States; (2) that the statement or record was false; (3) that the defendant knew that the statement or record was false; and (4) that the United States suffered damages as a result." *Wilkins ex rel. United States v. State of Ohio*, 885 F. Supp. 1055, 1059 (S.D. Ohio 1995).

The "knowledge" or "scienter" requirement, which is an essential element of all three types of violations alleged by Relator, is defined by statute. "Knowing" and "knowingly" mean "that a

person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).  Due to this scienter requirement, it is settled law that "[a] mere violation of a regulatory provision, in the absence of a knowingly false or misleading representation, does not amount to fraud." *Trim*, 31 F. Supp. 2d at 1315.  "For a statement to be knowingly false, it must be more than merely an innocent mistake or misinterpretation of a regulatory requirement." *Id.*; *see also Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (explaining that "[i]nnocent mistake" and "negligence" do not satisfy the FCA's knowledge element and that "[t]o take advantage of a disputed legal question . . . is to be neither deliberately ignorant nor recklessly disregardful").

B.    Types of Claims

The Tenth Circuit has recently explained that the FCA "recognizes two types of actionable claims – factually false claims and legally false claims." *Conner*, 543 F.3d at 1217.  In a factually false case, "proving falsehood is relatively straightforward:  A relator must generally show that the payee has submitted an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.* (internal quotation omitted).  When the relator's claim is based on an alleged legal falsehood, "the relator must demonstrate that the defendant has certified compliance with a statute or regulation as a condition to government payment, yet knowingly failed to comply with such statute or regulation." *Id.* (internal quotation

and alteration omitted).  Claims falling in this second category are referred to by the Tenth Circuit as "legally false certification claims."  *Id.*[7]

Legally false certification claims "can rest on one of two theories – express false certification, and implied false certification."  *Id.*  "An express false certification theory applies when a government payee falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."  *Id.* (internal quotation omitted).  "This promise may be any false statement that relates to a claim, whether made through certifications on invoices or any other express means."  *Id.*  "Under an implied false certification theory, by contrast, courts do not look to the contractor's actual statements; rather, the analysis

---

[7]  A secondary source provides additional explanation regarding the difference between factual and legal falsity and explains that, in the health care area, these two types of "falsity" often overlap:

> "Falsity" has at least two dimensions under the FCA. First, a claim may be false because it seeks reimbursement for services or goods not provided or for services or goods provided in a manner different from that described in the claim form. Second, a claim may be false in light of relevant law or contract terms.  *In the health care area, these two sources of falsity sometimes merge, usually with dire consequences for defendants.* The first type of "falsity" is fairly characterized as factual falsity, viz, the claim either incorrectly describes the services or goods provided or seeks reimbursement for goods or services not provided.  In these cases, the claim may be considered to be intrinsically false. . . .  The second type of "falsity" may be characterized as "legal" falsity, viz, the claim is not factually false (i.e., not false on is face), but it is false for an extrinsic legal, regulatory or contractual reason.

Robert Fabrikant, Glenn E. Solomon, *Application of the Federal False Claims Act to Regulatory Compliance Issues in the Health Care Industry*, 51 Ala. L. Rev. 105, 111 -112 (1999) (footnote omitted) (emphasis added); *see also In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 345 (D. Conn. 2004) (government alleged that defendants' failure to disclose that cardiac devices for which it sought payment were investigational devices and not approved for marketing by FDA resulted in both factually false and legally false claims).

focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Id.*

In cases involving a false certification theory (whether express or implied), the claim is "actionable only if it leads the government to make a payment which it would not otherwise have made" and the false statement was "material to the government's decision to pay." *Id.* at 1219. This is known as a "materiality" requirement. *Id.* The Tenth Circuit explicitly adopted a materiality requirement in the context of legally false certification claims but declined to "address whether materiality is an element of . . . other theories of FCA liability." *Id.* at 1220 n.6. Therefore, in addition to the elements set forth above for each type of FCA violation, the Tenth Circuit has recently added a materiality requirement for all FCA claims based on a theory of legally false certification. The Tenth Circuit has not taken a position as to whether materiality is a requirement in a more garden-variety factual falsity case.[8]

---

[8] The majority position appears to be that materiality is a requirement in every FCA case. *See United States v. Southland Mgmt. Corp.*, 326 F.3d 668, 679 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("There should no longer be any doubt that materiality is an element of a civil False Claims Act case. Our past precedent and every circuit that has addressed the issue have so concluded."); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("Liability under the False Claims Act is subject to the further, judicially imposed requirement that the false statement or claim be material."); *United States ex rel. Oliver v. The Parsons Corp.*, 498 F. Supp. 2d 1260, 1288-89 (C.D. Cal. 2006) (collecting cases). However, where the allegation is a factually false claim, any "materiality" requirement would seem to be easily met in that the government paid a claim in a factually wrong amount, paid for a service that was not actually provided, or paid an amount greater than it should have based on the service actually provided. *See Conner*, 543 F.3d at 1223 ("[W]here the validity of actual costs is at issue, there can be little question that had the government known of the alleged fraud, it would not have made the payments.").

## V.    Analysis of Relator's FAC

Relator alleges that the following practices of EOOC violate one or more provisions of the FCA:  (1) altering diagnosis "codes" after Medicare denied payments and then resubmitting false claims to Medicare (FAC ¶ 19);[9] (2) billing existing patients as new patients (*id.* ¶ 22); (3) "upcoding" pre-operation visits that lasted less than five minutes (*id.* ¶ 23);[10] (4) submitting claims in conjunction with a clinical study conducted by Dr. Rodney Plaster that contained fraudulent diagnoses and with knowledge that such visits were not medically necessary (*id.* ¶ 21); (5) delivering durable medical equipment to patients without maintaining written records of delivery (*id.* ¶ 24); (6) failing to disclose the existence of primary payers on Medicare claims (*id.* ¶ 25) and then retaining overpayments by Medicare that should have been refunded to the government after the primary payer paid (*id.* ¶ 18(a)(i)); and (7) waiving Medicare co-insurance and/or deductible requirements

---

[9] The term "codes" throughout this Order refers to certain numerical designations assigned to patient visits by the American Medical Association ("AMA"). According to the AMA Evaluation & Management Services Guide, "[w]hen billing for a patient's visit, codes are selected that best represent the services furnished during the visit." (Evaluation & Management Services Guide, Ex. 3 to Br. in Support of Mot. to Dismiss, at 10.) "The two common sets of codes used are:  Diagnostic or International Classification of Diseases, 9th Revision, Clinical Modification codes; and Procedural or American Medical Association Current Procedural Terminology Codes." (*Id.*) The second set of codes are commonly referred to as "CPT codes."

[10] "Upcoding," another term used in this Order, refers to "the practice of billing Medicare for services or equipment designated under a code that is more expensive than what a patient actually needed or was provided" the submission of a claim containing a higher CPT code than the visit actually warranted." *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 498 n.2 (6th Cir. 2007) (explaining that upcoding is a "common form of Medicare fraud") (internal quotation omitted).

for certain patients, resulting in (a) claims containing misstated amounts actually charged to the Medicare patient and (b) violations of Medicare's anti-kickback provisions (*id.* ¶¶ 27, 28).[11]

Generally, EOOC's arguments in support of dismissal are: (1) Relator fails to plead fraud with particularity, and (2) Relator misunderstands the relevant Medicare regulations, fails to plead any Medicare non-compliance at all, and therefore fails to plead the existence of any false or fraudulent claims. (*See* Br. in Support of Mot. to Dismiss 2 ("Most of [Relator's allegations reflect her ignorance of billing requirements and do not set forth sufficient allegations under Rules 9(b) and 12(b)(6).").) In its reply brief, EOOC also argued that Relator's claims should be dismissed based on her failure to sufficiently allege the element of "materiality."

Before addressing these arguments in relation to each alleged fraudulent practice, the Court makes the following general observations. First, Relator's FAC does not explain whether she proceeds, with respect to each type of fraudulent scheme alleged above, on a theory of factual falsity, legal false certification, or both. Nor did the parties expressly address the proper classification of Relator's claims as legally false, factually false, or both.[12] In her response brief, Relator addresses "false certification" only in relation to Paragraph 24 (improper proof of delivery for durable medical equipment) and the anti-kickback theory alleged in Paragraph 28 (waiving co-

---

[11] Relator voluntarily dismissed her allegation that EOOC charged patients more than their Medicare deductible, as set forth in Paragraph 26 of the FAC. (*See* Resp. to Br. in Support of Mot. to Dismiss 37.) Based on this dismissal, it appears that Relator also intends to voluntarily dismiss similar allegations related to retention of these overpayments contained in Paragraphs 18(b) and (c) of the FAC. Relator did not address these in the appropriate section of her response brief (*see id.* at II.B), and the Court finds that they have also been dismissed.

[12] *Conner*, which is the first Tenth Circuit opinion to *explicitly* lay out the types of FCA claims and the difference between factual and legal falsity, was decided after briefing in this case was complete.

insurance and deductibles).  Therefore, it appears that Relator relies on a legally false certification

theory only for purposes of Paragraphs 24 and 28 of the FAC.  Regardless, classification of Relator's

claims is not crucial based on EOOC's arguments at this stage of the proceeding.  By citing,

attaching, and making arguments regarding application of the relevant Medicare regulations and

guidelines, EOOC is asserting that Relator's claims fail because, in the absence of non-compliance,

it could not possibly have submitted "false" claims, let alone intentionally false claims.  This

argument – Relator's failure to allege any actual non-compliance with Medicare rules – has the same

impact whether Relator is proceeding on a theory of factual falsity or legal false certification.  That

is, if the practices are compliant, there can be no "false" claims and no "false" certifications of

regulatory compliance.[13]  Second, with respect to "materiality," the Tenth Circuit first explicitly

adopted this requirement in *Conner*, which was decided after Relator filed her FAC.  *See Conner*,

543 F.3d at 1219.  In addition, it is not clear whether the Tenth Circuit requires  materiality for all

---

[13] For purposes of going forward, it is the Court's initial impression that most, if not all, of Relator's remaining claims may proceed as factual falsity claims.  That is, Relator alleges that EOOC submitted "false" claims because it submitted claims that contained a knowingly incorrect amount charged, a knowingly incorrect description of the service provided to the Medicare patient, or a knowingly incorrect and "upcoded" billing code.  In such cases, it does not appear necessary for a relator to rely on a "false certification" theory of liability.  *See Bledsoe*, 501 F.3d 493 (addressing motion to dismiss allegations that medical service provider engaged in various types of upcoding and fraud that increased reimbursements received from Medicare without discussing "false certification" theory).  Reliance on "false certification" seems to be more common where there is a false certification of legal compliance that leads to wrongful payments by the government, but there is no falsity involved with the actual requests for payments themselves.  *See, e.g., Conner*, 543 F.3d at 1218 (relator argued that annual cost report submitted by hospital contained an express "false certification" of regulatory compliance and that *any* failure by hospital to comply with *any* underlying regulations rendered *all* resulting claims during an entire year to be "fraudulent"); *Shaw*, 213 F.3d at 531 (allowing § 3729(a)(1) liability to attach under a theory of "false certification" for invoices submitted for payment, which "only billed the amount called for by the fixed price contract and did not contain any factual misrepresentations," because contractor failed to comply with specific requirements within its government contract at the time it submitted the invoices).

16

types of FCA claims. *Id.* at 1220 n.6. Therefore, the Court will not dismiss Relator's claims based on any failures to sufficiently allege materiality, but the parties may address this issue in future briefs.  With these principles in mind, the Court proceeds to separately analyze each paragraph of the FAC to determine if it states a claim for relief.  *See Bledsoe*, 501 F.3d at 509 (explaining that "a 'paragraph-by-paragraph' approach is not only permissible, but required, if the paragraphs of a relator's complaint allege separate and unrelated fraudulent conduct").

A.      Alteration of Diagnosis Codes (¶19)

Relator alleges that EOOC engaged in the practice of changing diagnosis codes after a claim was denied by Medicare and resubmitting such claim with new codes that were not supported by dictation.  For example, Relator alleged:

> Julia S., Chart # 267167, was seen by Defendant on February 2, 2005 and incurred charges of $219.00 that were filed with Medicare on February 8, 2005, Claim # 8895671 with diagnosis 924.5 Leg Contusion. Medicare denied this claim on February 11, 2005. This claim was re-filed with a substituted diagnosis of 729.5, pain in limb, and 726.61, tendinitis or bursitis. Ms. Sharp researched this claim and determined that the dictated diagnosis was never changed from the original diagnosis of leg contusion. After Medicare denied this claim, Rhonda Vera requested a different diagnosis for this claim so that it could be paid. Ann Winters changed the doctor's diagnosis code to pain in limb and tendinitis/bursitis, which was not supported by the dictation, and the claim was resubmitted to Medicare for payment.

(FAC ¶ 19(a).)  EOOC argues that these allegations lack reliability because Relator failed to allege how, as the Front Desk Supervisor, she could "possibly possess the requisite knowledge and training to make her allegations sufficiently reliable to pass muster under Rule 9(b)."  (Br. in Support of Mot. to Dismiss 18.)

1.      *Paragraph 19, Subparts (a), (b)*

Relator's allegations in Paragraph 19(a) and (b) of the FAC are sufficient to satisfy Rule 9(b) and Rule 12(b)(6).  As to Relator's knowledge of this practice, she alleges that: (1) she witnessed

17

this practice herself; (2) another employee, Rhonda Vera ("Vera") told Relator that Vera had been

asked by EOOC's administrator, Robin Smith ("Smith"), to change certain codes after a claim had

been denied by Medicare; (3) Vera told Relator that when Vera refused to change the codes, Smith

changed the codes herself and also altered the physician's dictation; and (4) Relator researched

various accounts and discovered two "sample" cases in which codes were altered and submitted to

Medicare for payment.  These two "sample" cases are identified by patient name, chart number, and

claim number.  Her allegations include the date of the original claim submitted to Medicare, the date

of the resubmitted claim to Medicare, the original diagnosis code, and the resubmitted diagnosis

code.  (*See* FAC ¶ 19(a), (b).)  Thus, Relator's allegations include many, if not all, of the items on

the Tenth Circuit's "checklist" for compliance with Rule 9(b).  *See Sikkenga*, 472 F.3d at 727 (listing

the dates of the false claims, the content and identification numbers of the forms or the bills

submitted, the fees charged to the government, the goods and services for which the government was

billed, the persons involved in the billing, and the length of time between the alleged fraudulent

practices and the submission of the claims based as possible methods of satisfying Rule 9(b)).

EOOC argues that Relator lacks proof and the requisite training to allege that the resubmitted

claims were actually false – *i.e.*, that a mere front desk supervisor could never know that the altered

code lacked veracity or was not supported by dictation.   However, the Court finds Relator's

allegations sufficient.  Relator alleges that codes were altered after a claim was denied, that the

supporting physician dictation was altered, and that the claim was resubmitted for payment.  It does

not require any training or expertise to realize that a resubmitted claim based on manufactured

dictation, following a denial by Medicare, carries with it an indicia of knowing falsity.  Therefore,

the Court finds these allegations regarding intentional alteration of billing codes to state a claim for

relief under the FCA.  *See United States ex rel. Doe v. DeGregorio*, 510 F. Supp. 2d 877, 886-89 (M.D. Fla. 2007) (affirming grant of prejudgment remedy in FCA case) (finding government presented sufficient evidence that management had instructed employees to "change codes" and that alteration of codes supported finding of FCA violation).

2. *Paragraph 19, Subpart C*

Relator's allegations in Paragraph 19(c) are much less specific and are not tied to any particular patient, chart number, or claim.  Relator merely alleges that she observed Sabrina Rogers ("Rogers") "look at previous visits on patient accounts and use earlier diagnosis information if the doctor failed to write one on the charge ticket" and that Smith "told [Rogers] to do it that way." (FAC ¶ 19(c).)  These allegations are not pled with particularity as required by Rule 9(b) because they do not contain *any* of the details listed in Tenth Circuit law and do not identify any false claims or representations made to the government.  *See Sikkenga*, 472 F.3d at 727.  As argued by EOOC, the "charge ticket" referenced in this allegation is merely an internal document generated to assist the billing staff in preparing invoices.  Even assuming Smith instructed Rogers to write something fraudulent on a charge ticket, there is no allegation that this resulted in the submission of a false claim or the making of any false statement to the government.  Further, as also argued by EOOC, Rogers' use of a previous diagnosis code might have been reasonable if it appeared on the patient's medical chart, and the physician did not indicate any new diagnosis.

In addition, these allegations are not saved by the sufficiently pled examples provided in Paragraph 19(a) and (b).  This is because the allegations in Paragraph 19(c) are based on an entirely different practice and cannot be said to fall within the same "fraudulent scheme" as the examples provided in Paragraph 19(a) and (b).  *See Bledsoe*, 501 F.3d at 510 (holding that sufficiently pled

19

examples will support more generalized allegations of fraud so long as the examples are representative samples of the broader class of claims and so long as the "false scheme" is construed "as narrowly as is necessary to protect the policies promoted by Rule 9(b)").

> B.    Billing Existing Patients as "New Patients" (¶ 22)

In Paragraph 22, Relator alleges:

> [Relator], while fulfilling her duty to book appointments for [EOOC], personally witnessed existing patients being booked as "new conditions" but were billed as "new patients" even though they had been seen by the group within the last three years. Billing an existing patient as a "new patient" instead of a "new condition" resulted in Medicare being billed at a higher billing code and violated Medicare rules which define "new patient" as a patient who has not received any professional services from the physician group practice within the previous three years. [Relator's] research on this issue while employed with [EOOC] determined that multiple patient records indicated that the patient was scheduled for a visit with one of the doctors but would make a complaint about a new injury, and instead of the current doctor following up with the patient about this complaint, the patient would be referred to another doctor in the group for follow up on the "new" complaint as a "new patient." [Relator] saw this on an almost daily basis and, when she asked Robin Smith about the practice of billing the patient as a "new patient" instead of a "new condition" [Relator] was told that [EOOC] used the new condition identification for the patient in order to generate a patient encounter form but that the new condition is always billed as a "new patient" since the patient had not seen any of the doctors in the group for the new condition.

(FAC ¶ 22.)  Relator did not provide any specific examples of this practice and did not identify any specific false claims or false records.  EOOC argues that Realtor's allegations are too generalized.  EOOC further argues that the allegations, accepting them as true, do not set forth a violation of controlling Medicare definitions and therefore cannot result in any intentionally false claims.

Relator's allegations in Paragraph 22 fail to satisfy Rule 9(b)'s particularity requirements.  First, the allegations are not specifically tied to any patient, claim number, or false claim but instead generally reference "multiple patient records."  Relator does not indicate when or in what amount Medicare was overbilled or identify the goods and services for which Medicare was overbilled.

20

Further, the allegations in the FAC are purely speculative in that Relator does not allege that any claim contained a knowing falsity or was supported by a knowingly false record.  The relevant manual defines a new patient as "one who has not received professional services from the physician or another physician *of the same specialty* who belongs to the same group practice, within the past three years."  *See Medicare Claims Processing Manual* (Pub. 100-4), Ch. 12, § 30.6.7 (emphasis added), *available at*  http://www.cms.hhs.gov/Manuals/IOM/list.asp.  Yet Realtor's allegations do not contain information that is specific enough to determine if the patient classified as a "new patient" was previously seen by an EOOC doctor within the same specialty.  In her response brief, Relator attempts to salvage this claim by arguing that the "new patient" classification occurred in every case "without regard to whether they had received professional services from a doctor in that specialty."  (Resp. to Br. in Supp. of Mot. to Dismiss 8.)  However, Relator is speculating that, if EOOC engaged in this practice in every case, there must have been a fraudulent claim somewhere in the bunch.  Such speculation is insufficient, and Relator's allegations are not pled with the requisite particularity.

C.     Upcoding for Pre-Operation Visits (¶ 23)

Relator alleges that she observed pre-operation visits being "upcoded . . . in that appointments were being marked at a higher level than the time actually spent with patients."  (FAC ¶ 23.)  Specifically, she alleges that:  (1) while sitting at the front desk, she observed patients check in for a pre-operation appointment, spend less than five minutes with a doctor, and then return to check-out; (2) while waiting outside examination rooms, she observed doctors spending less than five minutes with a pre-operation patient and overheard the doctor merely asking if the patient had any questions about the surgery; (3) she observed doctors re-dictating old medical history rather than

21

generating new information obtained from the patient during the pre-operation visit; (4) when she

inquired about this practice, she was told that Smith instructed the billing department to "bill pre-

operation visits at higher levels due to the amount of dictation that was generated from the pre-

operation visit;" (5) she heard doctors and their assistants state that they "loved conducting pre-

operation examinations" because they took only five minutes to complete; and (6) these visits were

improperly billed to Medicare as code 99214 or 99215, which was a higher billing code than was

justified by the time spent.  (*Id.* ¶ 23(a)-(g).)  EOOC argues that Relator misunderstands the

controlling Medicare regulations, has failed to allege any violations of the coding requirements, and

has therefore failed to allege the existence of a false claim.  EOOC further contends that Relator's

allegations are speculative and lack particularity because she is merely "guessing" at what code was

used.

The Court will first address whether Relator's allegations are sufficient to support a finding

of a false claim.  An office visit qualifying for CPT Code 99214 is described by the AMA as

follows:

> Office or other outpatient visit for the evaluation and management of an established
> patient, which requires at least 2 of these 3 key components: A detailed history; A
> detailed examination; Medical decision making of moderate complexity. Counseling
> and/or coordination of care with other providers or agencies are provided consistent
> with the nature of the problem(s) and the patient's and/or family's needs. Usually,
> the presenting problem(s) are of moderate to high severity. Physicians typically
> spend 25 minutes face-to-face with the patient and/or family.

*See Current Procedural Terminology*, *Fourth Edition*, *available at* https://catalog.ama-

assn.org/Catalog/cpt/cpt_search.jsp.[14]  An office visit qualifying for CPT Code 99215 is identical,

---

[14] Where the Court has cited a website, neither party provided an exhibit containing a copy
of the relevant publication.

except it involves medical decision-making of high complexity and typically involves a forty-minute patient visit.  (*Id.*)

In addition to these AMA definitions, the 1995 Documentation Guidelines for Evaluation & Management Services explains that history, examination, and medical decision making – and not time spent with the patient – are generally "the *key* components in selecting the level of E/M services."  (1995 Documentation Guidelines for Evaluation & Management Services, Ex. 1 to Br. in Support of Mot. to Dismiss, at 3.)  However, there is an exception to this rule for "visits which consist predominantly of counseling or coordination of care; for these services time is the key or controlling factor to qualify for a particular level of E/M service."  (*Id.*)  A section of the guidelines devoted to this exception, entitled "Documentation of an Encounter Dominated by Counseling or Coordination of Care," provides:

> In the case where counseling and/or care dominates (more than 50%) of the physician/patient and/or family encounter (face-to-face time in the office or other outpatient setting or floor/unit time in the hospital or nursing facility), time is considered the key or controlling factor to qualify for a particular level of E/M services.  If the physician elects to report the level of service based on counseling and/or coordination of care, the total length of time of the encounter (face-to-face or floor time, as appropriate) should be documented and the record should describe the counseling and/or activities to coordinate care.

(*Id.* at 15; *see also* 1997 Documentation Guidelines for Evaluation & Management Services, Ex. 4 to Br. in Support of Mot. to Dismiss, at 51 (containing identical provision).)  Another publication, entitled Evaluation & Management Services Guide, which is part of AMA's *Current Procedural Terminology*, provides an example of when a physician could use a code 99214 in a case where counseling and/or care dominates:  "[I]f  25 minutes was spent face-to-face with an established patient in the office and more than half that time was spent counseling the patient or coordinating

23

his or her care, CPT code 99214 should be selected." (Evaluation & Management Services Guide, Ex. 3 to Br. in Support of Mot. to Dismiss, at 29.)

Although the parties agree on the controlling definitions and guidelines, the parties dispute whether such provisions are fatal to Relator's claim. EOOC contends that, because Relator failed to specifically allege that the visits were reported based on counseling and/or coordination of care, she has failed to allege any Medicare non-compliance because time is not the controlling factor in every instance that 99214 or 99215 code is used. (Br. in Support of Mot. to Dismiss 29.) In other words, the physicians could have had a five minute, pre-operative visit that was properly coded as 99214 or 99215 because it was supported by documentation proving two of the three requirements: a comprehensive history; a comprehensive examination; or medical decision making of moderate or high complexity. In contrast, Relator argues that her pleadings are sufficient because they allege: (1) visits lasting less than five minutes, (2) visits consisting solely or predominantly of pre-operative counseling, for which time is the controlling factor, and (3) physicians' use of dictation from prior visits to provide documentation that would support a 99214 or 99215 billing code, all of which supports a finding of fraudulent upcoding.

Relator's allegations are sufficient to state a claim. The CPT code definitions indicate that face-to-face time is relevant, although not controlling, to *all* decisions of whether a visit qualifies for the 99214 or 99215 codes. The definitions themselves provide a "typical" time frame for a 99214 visit of 25 minutes, and a "typical" time frame for a 99215 visit of 40 minutes. In addition, the Centers for Medicare & Medicaid Services ("CMS"), in a November 2007 Report entitled Improper Medicare Fee-for-Service Payments Report, stated:

> CPT code 99214, office or other outpatient visit.  The physician should typically spend 25 minutes face-to-face with the patient *and* perform at least two of the following procedures: a detailed patient history, a detailed examination, and/or medical decision making of moderate complexity.

*Improper Medicare Fee-for-Service Payments Report - November 2007*, at Appx. E: Coding

Information (emphasis added), available at http://www.cms.hhs.gov.  Thus, regardless of whether

time was the "key" or "controlling" factor, *i.e.*, whether counseling and care predominated the visit

or a medical history, exam, or decision-making predominated the visit, the fact that visits lasted only

five minutes supports Relator's theory that EOOC fraudulently upcoded the visits to 99214 or

99215.  In addition, Relator alleges that she overheard the content of many such visits and that they

consisted merely of asking the patient if he or she had questions about the upcoming surgery.  (FAC

¶ 23(b).)  Although Relator did not expressly allege that "counseling and care predominated the

visits," (*see* 1995 Documentation Guidelines for Evaluation & Management Services, Ex. 1 to Br.

in Support of Mot. to Dismiss, at 15), her allegations are that these visits consisted solely, or

predominantly, of pre-operative counseling and were not spent conducting a comprehensive history,

a comprehensive medical examination, or making medical decisions of moderate or high complexity.

If accepted as true, time was the controlling factor, and the visits needed to last significantly longer

than five minutes in order to qualify for the submitted codes.

On a more basic level, 99214 and 99215 are the highest codes available for office visits and

reflect the highest levels of comprehensiveness and complexity.  *See generally United States v.*

*Singh*, 390 F.3d 168, 177 (2d Cir. 2004) (explaining that the "[d]etermination of the proper CPT

code among [99211-99215] depends on the complexity of the physician's decision-making, the

comprehensiveness of both the physical examination and the patient history, the severity of the

presenting medical problem, and the amount of face-to-face time that the physician spends with the

patient and the patient's family); *United States v. Janati*, No. 05-4255, 2007 WL 2197065, at * 1 (4th Cir. Aug. 1, 2007) (explaining that codes 99211-99215 are in "increasing order of complexity and comprehensiveness," with 99215 being the highest). A plain reading of the definitions indicates that a five-minute visit during which a doctor asks if a patient has any questions about an upcoming surgery would not normally qualify for the highest code. The Court finds that Realtor has stated a claim under the FCA based on knowingly fraudulent upcoding of pre-operation visits. *Cf. Cantrell v. N.Y. Univ.*, 326 F. Supp. 2d 468, 469 (S.D.N.Y. 2004) (making pre-trial rulings, indicating that claims survived pre-trial dispositive motions) (relator alleged that visits lasting five to ten minutes to administer a vaccine did not qualify for code 99215 and resulted in FCA violations).

The Court further finds that Relator's claim is pled with sufficient particularity because she has provided at least one example that includes nearly all items on the Tenth Circuit's Rule 9(b) checklist, including patient name, chart number, date of appointment, time spent during visit, submission of a claim with an allegedly fraudulent 99214 code, and evidence of payment by Medicare. (FAC ¶ 23(h)(1).) Some other examples allege that the visit was billed at the "99000 level" rather than specifying the 99214 or 99215 code. (*Id.* ¶ 23(h)(iii),(iv)). However, these examples contain other identifying information, such as patient name, chart number, date of visit, and doctor seen. Relator's failure to allege the precise code in these examples does not render the claim overly speculative, in light of the allegation in Paragraph 23(f), which makes clear that codes 99214 or 99215 are the focus of Relator's claim. In addition, although EOOC correctly points out that the phrase "99000 level" is an imprecise and even inaccurate label for 99214 and 99215 codes, Paragraph 23 as a whole is not imprecise or overly speculative and is supported by sufficient representative examples. *See Bledsoe*, 501 F.3d at 510 (holding that sufficiently pled examples will

support more generalized allegations of fraud so long as the examples are representative samples of the broader class of claims and so long as the "false scheme" is construed "as narrowly as is necessary to protect the policies promoted by Rule 9(b)").  Accordingly, this theory of upcoding pre-operation visits to 99214 or 99215 codes is sufficiently pled.

   D.  <u>Submission of False Claims Associated With Clinical Study (¶ 21)</u>

   The theory of fraud set forth in Paragraph 21 relates to a clinical study ("Zimmer Study") conducted by Dr. Rodney Plaster ("Plaster") for the benefit of Zimmer Instrumentation, a company that supplies hardware used in hip and knee replacement.  According to Relator, Plaster "would schedule periodic follow-up visits with the patients to gather data to be used in the studies and would bill Medicare for the visit even though it was not medically necessary or supported by the dictation provided by Dr. Plaster."  (FAC ¶ 21.)  Relator further alleges:

> This patient visit should have been coded as a follow up visit, if it was coded at all, but the paperwork would be submitted under a diagnosis code for degenerative joint disease, the original diagnosis that supported the surgery. Medicare regulations state that Medicare will not pay for items and services provided solely to satisfy the data collection needs of studies or trials such as the follow up studies conducted by Dr. Plaster. Dr. Plaster received payments from the medical supply company for his research.

(*Id.*)  Relator identified fourteen patients, by chart number and date of visit to Plaster, for which she claims Medicare was fraudulently billed.  (*Id.* ¶ 21(f)(i)-(xiv).)  For example, Relator alleges:

> Jessie C. saw Dr. Plaster for a 1-year recheck on his right knee on January 13, 2004 for a surgery that was performed on January 20, 2003. Medicare was billed for charges incurred on January 13, 2004 in the amount of $84.00, office visit, and $85.00, x-ray. On February 5, 2004, Medicare paid $9.24 on this charge ($105.98 write off), the patient paid his deductible of $51.47 (check number 5320) and Health Plan Services paid $2.31 as secondary payer for the co-insurance. Ms. Sharp's research established that this appointment was for a one-year follow up for the Zimmer study and there were no problems.

(*Id.* ¶ 21(f)(i).)  EOOC does not dispute that Plaster used data gathered at these appointments for the

Zimmer Study but argues that the appointments had other legitimate purposes that supported the

codes used.  EOOC argues that Relator's allegations are based on her subjective, incorrect belief that

Plaster's follow-up appointments with his patients must have been fraudulently billed because there

were no complications with the surgery.  According to EOOC, "Medicare disagrees with Sharp's

subjective view against preventive medicine."  (Br. in Support of Mot. to Dismiss 22 n.4.)

The parties are in agreement as to the governing standard, which is set forth in a September

2000 National Coverage Determination for Routine Costs in Clinical Trials ("NCD for Clinical

Trials") and which is available on the CMS website.  This standard provides:

> Medicare covers the routine costs of qualifying clinical trials, as such
> costs are defined below, as well as reasonable and necessary items and
> services used to diagnose and treat complications arising from
> participation in all clinical trials. All other Medicare rules apply.
> Routine costs of a clinical trial include all items and services that are
> otherwise generally available to Medicare beneficiaries . . . that are
> provided in either the experimental or the control arms of a clinical
> trial *except*:
>        . . .
> • *Items and services provided solely to satisfy data collection and
> analysis needs and that are not used in the direct clinical management
> of the patient (e.g., monthly CT scans for a condition usually requiring
> only a single scan);* and
>        . . .
> Routine costs in clinical trials *include*:
>        . . .
> • Items or services required solely for the provision of the
> investigational item or service (e.g., administration of a noncovered
> chemotherapeutic agent), *the clinically appropriate monitoring of the
> effects of the item or service, or the prevention of complications; and*
> • *Items or services needed for reasonable and necessary care arising
> from the provision of an investigational item or service* – in particular,
> for the diagnosis or treatment of complications. (emphasis added).

(NCD for Clinical Trials, Ex. 2 to Br. in Support of Mot. to Dismiss, at 3 (emphasis added).)  Again, however, the parties disagree as to whether this standard indicates that Relator's allegations fail to state a claim.  EOOC argues that the appointments billed in conjunction with the Zimmer Study were legitimate follow-up appointments for surgical patients that served the dual purpose of checking the patient's hip and knee replacement and gathering data for the clinical study.  Therefore, these appointments qualified as "clinically appropriate monitoring of the effects of the item or service, or the prevention of complications" and/or "[i]tems or services needed for reasonable and necessary care arising from the provision of an investigational item or service."  (*Id.*)  Relator contends that these appointments were instead "services provided solely to satisfy data collection and analysis needs and that are not used in the direct clinical management of the patient" that do not qualify for Medicare payment.  (*Id.*)  Realtor further contends that the claims contained fraudulent diagnosis descriptions – namely, degenerative joint diseases – that were not justified by the actual visit.

After close examination of the language used in Relator's FAC, the Court concludes that her allegations are sufficient to allege a knowing falsity in conjunction with the identified claims. Relator's allegations are that: (1) Relator was instructed to call patients and schedule appointments to gather information for the Zimmer Study; (2) patients complained about Medicare being billed for these appointments and complained about being asked to get a referral for these appointments from their treating physicians; (3) EOOC had different billing procedures and co-pay procedures for patients who complained about coming in for the study and patients who did not complain; and (4) Medicare was billed for many of these appointments under a "degenerative joint disease" diagnosis even though the dictation generated by Plaster indicated that the patient was having no problems. If true, these allegations state a claim for relief because the "follow-up" visits were not follow-up

visits at all but instead were services provided solely to satisfy data collection and analysis needs, which are not covered by Medicare.  Further, Relator's allegations of EOOC's handling of patient complaints indicates its knowledge that Medicare was fraudulently billed for these visits.  It may be that these visit were "clinically appropriate monitoring" and were "to prevent complications" from the original surgery; however, that is not what is alleged in the FAC.  What is alleged is a fraudulent scheme whereby EOOC submitted claims to Medicare containing fraudulent diagnoses, knowing that such claims were not supported by this diagnosis because the patients were seen solely for the Zimmer Study.[15]  Based on the agreed-upon standard, this billing would violate Medicare rules.

As to whether these allegations are pled with the requisite particularity, Relator identified fourteen patients by name, chart number, date of visit, and date of original surgery.  For many patients, she identified the allegedly fraudulent diagnosis – degenerative joint disease – under which Medicare was billed. For one patient, she identified the date of the Medicare invoice and the date and amount of the Medicare payment.  The Court finds this sufficient to satisfy the Tenth Circuit's pleading requirements and to provide representative examples of the fraudulent scheme alleged in this paragraph.  *See Bledsoe*, 501 F.3d at 510 (holding that sufficiently pled examples will support more generalized allegations of fraud so long as the examples are representative samples of the broader class of claims and so long as the "false  scheme" is construed "as narrowly as is necessary to protect the policies promoted by Rule 9(b)").

---

[15]  EOOC emphasizes Relator's use of the word "re-check" in Paragraph 15 of the FAC. Although Relator uses the word "re-check" to describe the visits, her allegation, read in context, is clearly that these visits had no medical purpose other than to provide data for the Zimmer Study.

E.     Failing to Disclose Primary Payers (¶ 25)

Relator alleges that EOOC engaged in a practice "whereby liability claims and worker's compensation patient accounts were billed to Medicare as a payer of first resort" and that this resulted in the submission of false claims because "Defendant failed to disclose the existence of a primary plan to Medicare." (FAC ¶ 25.) Relator further alleges that EOOC knowingly "failed to provide the proper coding on the tickets that would indicate a primary plan was available for coverage." (*Id.*) As one example, Relator alleges:

> Patient Gregory G., Chart #231226W was a Medicare and Worker's Compensation patient seen by Dr. Scott Rahhal on September 5, 2002 and incurred charges of $430.00. Medicare was billed for this claim and paid it on October 3, 2002 in the amount of $117.79 ($282.77 write off and $29.44 co-pay). The claim was then filed with the Worker's Compensation insurance and payment received on June 13, 2003 in the amount of $108.00 ($179.00 write off).

(*Id.* ¶ 25(a).) As a second example, Relator alleges:

> Eugene W., Chart #150115 was a group health plan and Medicare patient with PacifiCare as their primary insurance seen by Dr. Brad Boone on February 17, 2005 and incurred charges of $85.00. Medicare paid as primary insurance on April 11, 2005 in the amount of $22.56 ($56.80 write off and $5.64 co-insurance). PacifiCare was billed on April 12, 2005 and paid this account as primary payer on June 9, 2005 in the amount of $41.61 ($35.97 write off). Medicare should not have been billed as the primary payer.

(*Id.* ¶ 25(b).

The parties agree that, under relevant statutes and regulations, EOOC had an obligation to determine if Medicare was a primary payer or secondary payer and to avoid submitting a claim to Medicare in the first instance if Medicare was in fact a secondary payer. *See generally* 42 U.S.C. § 1395y(b)(6) (stating that entity submitting claim for payment must complete portion of claim form regarding existence of other health benefit plans to the best of its knowledge and is subject to penalties if it "provides inaccurate information relating to the availability of other health benefit

plans"); 42 C.F.R. § 489.20(g), (f) (stating that providers make the "basic commitment" to agree to "bill other primary payers before Medicare" and to "identif[y] any primary payers other than Medicare, so that incorrect billing and Medicare overpayments can be prevented"); *United States ex rel. Drescher v. Highmark, Inc.*, 305 F. Supp. 2d 451, 453-55 (E.D. Penn. 2004) (explaining regulations governing Medicare as secondary payer). The parties also agree that, as a general rule, the worker's compensation insurance and the group health plan referenced in Paragraph 21(a) and (b) are primary payers. The parties further agree that numerous exceptions exist to this general rule. For example, Medicare can pay primary in certain situations involving group health plans depending on the size of the employer. *See, e.g.*, 42 U.S.C. § 1395y(b)(1)(A)(ii) & (iii). In addition, Medicare is authorized to make conditional payments in certain situations involving worker's compensation insurance. *See, e.g.*, 42 C.F.R. § 411.45(a)(1) (providing that a conditional Medicare payment may be made if the "beneficiary has filed a proper claim for workers' compensation benefits, but the intermediary or carrier determines that the workers' compensation carrier will not pay promptly"); *Drescher*, 305 F.2d at 454-55 (explaining exceptions).

Again, however, the parties dispute the impact of these Medicare Secondary Payer regulations ("MSP regulations") on Relator's allegations. EOOC points out the above-listed exceptions contained in the MSP regulations and then argues that Relator "has failed to allege that none of the possible exceptions existed," (*see* Br. in Support of Mot. to Dismiss 34), and that Relator is merely guessing at the existence of a violation because "it could be that the Medicare billing was for one medical issue and that the Workers' Compensation claim was for another." (Reply in Support of Mot. to Dismiss 13.) Thus, EOOC contends that Relator's allegations lack particularity

and fail to state a claim. Relator argues that her allegations are sufficient, notwithstanding their failure to effectively plead around every statutory exception to the MSP regulations.

The Court finds Relator's allegations sufficient to state a claim for an FCA violation. Relator alleges that EOOC submitted false claims – *i.e.*, claims that were false on their face – by knowingly omitting relevant information regarding secondary payers from a claim and that EOOC did so in order to conceal later payments received by secondary payers. At least one court has found that an alleged intentional violation of the MSP regulations stated a claim for relief under the FCA, and the Court agrees with such analysis. *See Drescher*, 305 F. Supp. 2d at 456-61 (holding that allegations stated a claim for relief because, *inter alia*, relator alleged that defendant "was aware of applicable regulations regarding primary/secondary payment and knew that it was not accurately processing MSP claims"). Further, the Court rejects EOOC's contention that Relator's allegations fail to state a claim for falsity because they do not plead the non-existence of every exception to the general statutory rule. Although Relator's FAC fails to set forth every regulatory exception to the general rules governing primary and secondary payers and then explain why her factual allegations do not qualify for these exceptions, this does not indicate to the Court that Relator – an insider of the company – is merely "guessing" or has a "hunch" that a fraudulent claim or fraudulent statement in support of a claim occurred. Nor does it reflect a misunderstanding of the relevant guidelines. Relator's FAC contains detailed allegations that, barring application of a regulatory exception, support a finding of knowingly fraudulent claims aimed at obtaining unwarranted Medicare payments. The Court further finds that the fraud and false claims are pled with particularity because Relator identified several examples that include a patient name, chart number, date of treatment, amount billed to Medicare as primary payer, and amount later billed to the alleged secondary payer.

F.     Retention of Medicare Overpayments After Primary Payer Made Payment (¶ 18(a)(i))

Relator's theory as to Paragraph 18(a)(i) is that retention of the overpayments resulting from the false claims explained in Paragraph 25 constitutes a "reverse false claim," in violation of 31 U.S.C. § 3729(a)(7).  (*See* Resp. to Br. in Support of Mot. to Dismiss 24-28.)  Paragraph 18(a)(i) provides:

> Patient Gregory G., Chart #231226W was a Medicare and Worker's Compensation patient seen by Dr. Scott Rahhal on September 5, 2002 and incurred charges of $430.00. Medicare was billed for this claim and paid it on October 3, 2002 in the amount of $117.79 ($282.77 write off and $29.44 co-pay). The claim was then filed with the Worker's Compensation insurance and payment received on June 13, 2003 in the amount of $108.00 ($179.00 write off).  The money paid by Medicare had not been refunded as of September of 2004 and, under relevant Medicare guidelines, the provider is required to pay Medicare within 60 days of its receipt of payment from another payer primary to Medicare for the same service for which Medicare paid.

(FAC ¶ 18(a)(i).)  Similar to its arguments related to Paragraph 25, EOOC contends that Paragraph 18(a)(i) lacks specificity because "it could be that the Medicare billing was for one medical issue and the Workers' Compensation claim was for another" and Relator is merely "guessing that there was only one injury and that EOOC was paid twice."  (Reply in Support of Mot. to Dismiss 12-13.) EOOC further argues that "the fraudulent retention of Government monies – even if true – is not governed by the text of the FCA, since the FCA requires some type of overt action that [Relator] has simply not alleged."  (Br. in Support of Mot. to Dismiss 16.)

For the same reasons explained above in Part V.E, Relator's allegations in Paragraph 18(a)(i) are pled with sufficient particularity as to the existence of a fraudulent scheme and the resulting FCA violation.  In addition, Relator's allegations are not "guesswork" or overly speculative simply

because the facts, once discovered, may not actually support her allegation that EOOC engaged in a fraudulent scheme.

The Court further concludes that Relator's allegations in Paragraph 18(a)(i), which relate specifically to retention of the overpayments by Medicare, state a claim for relief under 42 U.S.C. § 3729(a)(7) as a reverse false claim. In this case, Relator has alleged that (1) EOOC made a false statement to the United States when it submitted the original claim but failed to disclose the existence of a primary payer, *i.e.*, workers' compensation insurance; (2) that EOOC did so in order to conceal or avoid its obligation, set forth in 42 C.F.R. § 489.20, to refund payments obtained from Medicare within sixty days of receipt of payment from a primary payer who pays for the same claim;[16] and (3) that the United States suffered damage because EOOC failed to reimburse Medicare after it received payment from the primary payer, in direct violation of 42 C.F.R. § 489.20(h) ("[I]f the provider received payment for the same services from Medicare and another payer that is primary to Medicare, [the provider must] reimburse Medicare any overpaid amounts within 60 days."). *See Wilkins ex rel. United States v. State of Ohio*, 885 F. Supp. at 1059 (setting forth elements of false claim). The alleged wrongful *act* is submission of a false statement or record to the United States – namely, that there was no primary payer for Gregory G.'s claim and that Medicare was solely responsible for payment.[17] The alleged wrongful *result* is EOOC's retention

---

[16] EOOC did not argue that the regulatory requirement to refund Medicare overpayments failed to qualify as an "obligation," as that term is used in § 3729(a)(7), *see generally Bahrani,* 465 F.3d at 1194-1203 (explaining that, as a general matter, "existing debts" qualify as "obligations" but that "contingent penalties" do not), and the Court does not reach this question.

[17] "Presentment" of the false statement to the government is not an element of a § 3729(a)(7) violation; instead, the bad act is the making or using of a false statement or record in order to avoid or conceal an obligation owed to the government. *See United States v. Bahrani*, 465 F.3d 1189, 1207 (10th Cir. 2006) (citing *United States ex rel. Koch v. Koch Indus.*, 57 F. Supp. 2d 1122, 1144

of money that should be paid to the government.  Thus, EOOC's principal argument – that retention of money is not the type of "overt" action necessary for an FCA violation – is without merit.  The Court finds that the allegations in Paragraph 18(a)(i) state a claim for a reverse false claim pursuant to § 3729(a)(7).

G.   Delivery of Durable Medical Equipment Without Maintaining Records of Delivery (¶ 24)

In Paragraph 24 of the FAC, Relator alleges:

> [Relator] also personally observed that the Defendant violated Medicare regulations with regards to durable medical equipment in that Defendant, as a supplier of durable medical equipment, would deliver durable medical equipment to its patients and did not maintain written records of the delivery. According to Medicare guidelines, the written record of delivery must include the beneficiary's signature acknowledging receipt of the equipment.  Durable medical equipment suppliers, such as Defendant, are required to submit proof of delivery containing the signature of the beneficiary as part of the claims process to receive payment for the equipment from Medicare or certify that this record is maintained by the supplier. Defendant submitted these claims without obtaining signed proof of delivery and, thereby, submitted false claims to Medicare regarding durable medical equipment supplied to its patients.

(FAC ¶ 24.)  Relator provided twelve examples of these alleged practices, identified by patient name, chart number, and date the equipment was provided.  (*Id.* ¶ 24(a)-(l).)  For example,  Relator alleges that a certain patient was "supplied a back brace at her home on November 8, 2004 but did not sign any paperwork in which she accepted delivery of this brace."  (*Id.* ¶ 24(a).)

Relator's allegations in this paragraph are based on a false certification theory of liability. (*See* Resp. to Br. in Support of Mot. to Dismiss  13 ("Although the claims submitted . . . are not facially false, since the [equipment] may have been delivered to the beneficiary, the claims still violate the FCA under either an express or implied certification theory . . . .").)  EOOC argues that,

_____

(N.D. Okla. 1989)).  Nonetheless, "presentment" of the false statement is alleged here.

even assuming that an express or implied false certification theory of FCA liability is viable, her allegations fail to state a claim because Medicare guidelines simply do not require a signature as proof of delivery. (Br. in Support of Mot. to Dismiss 31-33.)

EOOC is a Medicare-approved supplier of durable medical equipment, prosthetics, orthotics, and supplies ("DMEPOS"). *See* 42 C.F.R. § 424.57(a) (defining "DMEPOS" and "DMEPOS supplier"). Upon applying for Medicare billing privileges, EOOC certified that it would "be responsible for the delivery of Medicare covered items to beneficiaries and maintain proof of delivery." 42 C.F.R. § 424.57(c)(12). The Medicare Program Integrity Manual expands upon the regulations and provides:

> Suppliers are required to maintain proof of delivery documentation in their files. The proof of delivery requirements are outlined below according to the method of delivery. The three methods of delivery are:
> • Supplier delivering directly to the beneficiary or authorized representative;
> • Supplier utilizing a delivery/shipping service to deliver items; and
> • Delivery of items to a nursing facility on behalf of the beneficiary.
> Proof of delivery documentation must be available to the DME MAC, DME PSC, and ZPIC on request. *All services that do not have appropriate proof of delivery from the supplier will be denied and overpayments will be requested.* Suppliers who consistently do not provide documentation to support their services may be referred to the OIG for imposition of CMPs or Administrative Sanctions.

*Medicare Program Integrity Manual*, Ch.5, § 5.8, *available at* www.cms.hhs.gov/manuals/downloads/pim83c05.pdf (emphasis added). Cigna Government Services ("Cigna") is the Medicare Administrative Contractor for DMEPOS suppliers in Oklahoma, such as EOOC. Cigna's manual provides:

> You may deliver directly to the beneficiary or the designee. *An example of proof of delivery to a beneficiary is having a signed delivery slip.* It is recommended that the delivery slip include: 1) The beneficiary's name; 2) The quantity delivered; 3) A detailed description of the item being delivered; 4) The brand name; and 5) The serial number. The date listed on the delivery slip must be the date that the DMEPOS item was received by the beneficiary or designee. . . . *If you utilize a shipping*

> *service or mail order, an example of proof of delivery would include the service's tracking slip and your own shipping invoice . . . . You may also utilize a return postage-paid delivery invoice from the beneficiary or designee as a form of proof of delivery.*  The descriptive information concerning the DMEPOS item (i.e., the beneficiary's name, the quantity, detailed description, brand name, and serial number) as well as the required signatures from either the beneficiary or the beneficiary's designee should be included on this invoice as well.

*DME MAC Jurisdiction C Supplier Manual*, Ch.3, Part 7 at 14-15 (emphasis added), *available at* www.cignagovernmentservices.com/jc/pubs/pdf/Chpt3.pdf.   Relator argues that, "[g]iven this repeated emphasis on the 'signature' requirement, it is clear that CIGNA requires that the proof of delivery be in documentary form that includes the signature of either the beneficiary or the proper designee." (Resp. to Br. in Support of Mot. to Dismiss 15.)  In contrast, EOOC contends that a good-faith reading of the guidelines does not require signatures, and that a false claim does not exist simply because EOOC did not utilize the "proof of delivery that [Relator] (the Front Desk Supervisor) thought most appropriate." (Reply in Support of Mot. to Dismiss 9.)

Relator's allegations, accepting them as true, fail to state a claim for relief.  The above guidelines make clear that a signature from the beneficiary is but one "example" of proof of delivery.  There are other methods of proving delivery – a service tracking slip and a delivery invoice.  In the examples alleged, the patients were "supplied" with the equipment at their homes, but it is not clear from the FAC whether the items were hand-delivered or shipped to the patients. (*See* FAC ¶ 24(a)-(l).)  However, regardless of the method of delivery, neither the Medicare regulations nor the secondary materials expanding upon the regulations explicitly require a signature.  Instead, all relevant guidelines contemplate several methods of proving delivery.  Accordingly, Relator has failed to allege that EOOC, by generally failing to obtain patient signatures on delivery forms, is out of compliance with the relevant guidelines requiring proof of delivery.  In

38

turn, Relator has failed to allege any underlying non-compliance, even assuming EOOC certified

that it would comply with the proof of delivery rules.  In addition, in contrast to all of Relator's other

allegations, Relator has not alleged any type of scheme whereby EOOC sought to receive payments

to which it was not entitled.   Nor has EOOC engaged in ant type of fraudulent scheme or

"intentional lie" when it submitted claims for payment.  This is a requirement for a FCA claim, even

in the context of a false certification theory.  *See United States ex rel. Hendow v. Univ. of Phoenix*,

461 F.3d 1166, 1172 (9th Cir. 2006) (stating that, under false certification theory, there must be an

"intentional, palpable lie" and an actual "false" claim made to the government "rather than a mere

unintentional violation").  Accordingly, the allegations in Paragraph 24 fail to sufficiently allege the

elements of falsity or knowledge.

> H.      Waiver of Co-Insurance and/or Deductible Requirements (¶ 27)

In Paragraph 27, Relator alleges:

> [EOOC] submitted false claims by instituting a practice of waiving Medicare
> co-insurance[18] and/or deductible requirements for certain patients, including
> employees and members of employee's families. Defendant utilizes a code for
> patients that are seen as "insurance only", Type 25, and does not bill them for their
> portion of the Medicare co-insurance or deductible. . . . The practice of waiving
> Medicare deductibles and co-insurance requirements causes a false claim to be filed
> . . . .

(FAC ¶ 27 (footnote added).)  Relator identified six instances of this practice involving the same

patient, all of which contain the date of visit, the doctor seen, the Medicare claim number, the

amount claimed, and the amount that was allegedly wrongfully "written off" or waived by EOOC.

---

[18] "'Copayment' ('coinsurance') is the portion of the cost of an item or service which the
Medicare beneficiary must pay. Currently, the Medicare Part B coinsurance is generally 20 percent
of the reasonable charge for the item or service."  Department of Health and Human Services,
*Publication of OIG Special Fraud Alerts*, 59 F.R. 65372, 65374 (Dec. 19, 1994).

(*See id.* ¶ 27(a)-(f).)   Relator identified twelve other Medicare patients whose accounts were allegedly "written off" by EOOC employees on various dates.  (*See id.* ¶ 27(g)-(r).)

Relator offers two different theories as to how this practice results in FCA violations: (1) the practice directly violated § 3729(a)(1) and § 3729(a)(2) because EOOC intentionally overstated the amount a patient was charged for the visit, (*see* Resp. to Br. in Support of Mot. to Dismiss 21-23); and (2) the practice violated Medicare's anti-kickback provisions, which, in turn, results in an FCA violation based on a false certification theory (*see id.* 28-31).[19]  EOOC argues that Relator has failed to state a claim for relief as to either theory of liability.  EOOC further contends that Relator's allegations are not pled with requisite particularity.

1.      *Rule 9(b)*

As an initial matter, the Court concludes that the allegations in Paragraph 27(g)-(r) are not pled with the requisite particularity.  Unlike the more specific allegations in Paragraph 27(a)-(f), these allegations do not contain any identifying information or even any allegations regarding EOOC's submission of false claims or false statements in support thereof.  Instead, Relator merely identified a patient and then stated that such patient's account was "administratively written off" or "courtesy adjusted" on a particular date.  For these patients, Relator did not allege the date or amount that any alleged false claim was submitted to Medicare.  Nor does Relator specifically allege that co-insurance or deductibles were waived for these patients.  As argued by EOOC, an allegation

_____

[19]  Although Relator asserted "violation of Medicare Anti-Kickback Statute/Stark Law" as a separate cause of action (*see* FAC ¶ 49-51), her response brief indicates that these allegations are merely a second theory of establishing an FCA violation. (*See* Resp. to Br. in Support of Mot. to Dismiss 21 (explaining two theories of her FCA claim) & 30 (asserting that Relator "can bring her anti-kickback allegations under the False Claims Act.").)  Accordingly, Relator's fourth cause of action will be dismissed, and these allegations will be considered part of Relator's first and second causes of action.

that an account has been "written off" is insufficient to allege fraud with particularity because these accounts may have been written off for numerous other reasons unrelated to fraud, including the fact that they were not collectable.   In contrast to the allegations in Paragraph 27(a)-(f), which involve identification of a false claim and fraudulent scheme, the remaining allegations are not pled with the requisite particularity.

The Court further concludes that, construing the fraudulent scheme as narrowly as necessary to promote the policies underlying 9(b), the allegations in Paragraph 27(a)-(f) are not "representative examples" that function to save the less specific allegations in the remaining subsections.  *See Bledsoe*, 501 F.3d at 510.  A careful review of the FAC reveals that the allegations in Paragraph 27(g)-(r) have very little in common with the fraudulent scheme alleged in Paragraph 27(a)-(f), which involves one particular patient.  A fraudulent scheme of regularly waiving co-insurance for a favored patient, supported by dates of Medicare claims, is quite distinct from a more generalized practice of "writing off" patient accounts, without any reference to submission of actual Medicare claims or the reasons for the "write offs."   Thus, the allegations in Paragraph 27 (g)-(r) are dismissed, and the analysis below applies only to Paragraph 27(a)-(f).

2.      *False Claims Theory of FCA Liability*

When applicable, Medicare typically pays eighty percent of "the reasonable charges for the services."   42 U.S.C. § 1395l(a)(1).   The law "allows for flexibility in the determination of reasonable charges," and there are several criteria for determining what charges are "reasonable."  *See* 42 C.F.R. § 405.502(a)(1)-(10).  The "reasonable charge" is "determined by the carriers (*subject to any deductible and coinsurance amounts* as specified in §§ 410.152 and 410.160 of this chapter)."

41

*Id.* § 405.501(a) (emphasis added).  In its section entitled "Applying Criteria for Reasonable Charge

Determination," the Medicare Claims Processing Manual provides:

> Physicians or suppliers who routinely waive the collection of deductible or coinsurance from a beneficiary constitute a violation of the law pertaining to false claims and kickbacks. . . .  Deductible and coinsurance amounts are taken into account (included) in determining the reasonable charge for a service or item. In this regard, a billed amount that is not reasonably related to an expectation of payment is not considered the "actual" charge for the purpose of processing a claim or for the purpose of determining customary charges.

*Medicare Claims Processing Manual*, Ch. 23, § 80.8.1, available at

www.cms.hhs.gov/manuals/downloads/clm104c23.pdf.  The "false claim" occurs, according to the

Department of Health and Human Services Office of Inspector General ("OIG"), because a

"provider, practitioner, or supplier who routinely waives Medicare copayments or deductibles is

misstating its actual charge."  Department of Health and Human Services, *Publication of OIG

Special Fraud Alerts*, 59 F.R.65372, 65374-65375 (Dec. 19, 1994).  In turn, the Medicare program

pays more than it should for a particular visit.  *See id.* at 65375 (providing the following example

of a false claim: "If a supplier claims that its charge for a service is $100, but routinely waives the

co-payment, the actual charge is $80. Medicare should be paying 80% of $80 (or $64), rather than

80% of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is

paying $16 more than it should for the service.").  The OIG explained that one exception to

"prohibition against waiving copayments and deductibles is that providers . . . may forgive the

copayment in consideration of a particular patient's financial hardship."  *Id.*  However, this

exception "should be used occasionally to address the special financial needs of a particular patient,"

and "[e]xcept in such special cases, a good faith effort to collect deductibles and copayments must

be made."  *Id.*

42

The Court finds that Relator's allegations are sufficient to state a claim for FCA violations. Relator has alleged the precise scenario outlined in the *Medicare Claims Processing Claims Manual* by alleging that EOOC routinely waived the collection of coinsurance from a beneficiary – namely, the patient identified in Paragraphs 27(a)-(f).  The claims identified in these sections satisfy the falsity element because EOOC misstated the actual charge.  Relator further alleges that EOOC engaged in this practice knowingly because EOOC failed to waive the co-insurance for the majority of patients, thereby evidencing its knowledge that the practice was fraudulent.

EOOC argues that Relator fails to state a claim because she has not alleged that "the purpose of any purported insurance only billing was to induce patients to obtain Medicare services."  (Br. in Support of Mot. to Dismiss 37.)  While this argument is certainly relevant to Relator's anti-kickback theory of FCA liability, *see United States v. McClatchey*, 217 F. 3d. 823, 835 (10th Cir. 2000) (discussing and adopting the "one purpose" test in context of anti-kickback claim); *United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F. Supp. 2d 39, 54 (D. Mass. 2001) (same), the argument is not relevant to Relator's more straight-forward theory that the practice resulted in the submission of facially false claims on the dates alleged.  The Court finds Relator's allegations sufficient to satisfy the FCA's scienter requirement because Relator alleges that EOOC knowingly lied to the United States regarding the amount charged to a particular patient, without regard to EOOC's underlying motivation for lying.

EOOC also contends that Relator's allegations fail to state a claim because Relator has not alleged that waivers of co-insurance or deductibles by EOOC are "routine."  (Br. in Support of Mot. to Dismiss 37.)  However, the relevant manual provides that physicians "who routinely waive the collection of deductible or coinsurance from *a beneficiary* constitute a violation of the law pertaining

to false claims and kickbacks." *Medicare Claims Processing Manual*, Ch. 23, § 80.8.1, *available at* www.cms.hhs.gov/manuals/downloads/clm104c23.pdf (emphasis added).  In this case, Relator alleges that EOOC waived co-insurance for one particular patient for every visit the patient made between July 28, 2003 and February 9, 2004.  This indicates that the waiver for this particular patient was purposeful and was done "routinely."   EOOC appears to contend that a "routine" practice must involve numerous patients; however, this is contrary to the "a beneficiary" language contained in the manual.  In addition, the crux of Relator's claim is that EOOC made a special exception for one particular patient, and that this practice resulted in the submission of knowing false claims for that patient.  The Court sees no reason to impose a requirement that the practice involved more than one patient or even more than one occurrence, since liability arises under § 3729(a)(1) and (2) upon the submission of any false claim or using of any false record.  Accordingly, Relator's allegations are sufficient to state a claim for FCA liability based on the false claims submitted as a result of the alleged practice of waiving co-insurance.

3.   *Anti-Kickback Theory of FCA Liability*

Relator's second theory of liability is based upon EOOC's alleged violation of Medicare's anti-kickback provision, 42 U.S.C. § 1320a-7b(b).  In relevant part, this section provides:

> b) Illegal remunerations
> . . .
> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
> . . .
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

44

42 U.S.C. § 1320a-7b(b)(2)(B). A waiver of co-insurance can implicate the anti-kickback provision because "[d]iscounts, rebates, or other reductions in price . . . induce the purchase of items or services payable to Medicare or Medicaid." *Medicare Program Integrity Manual*, Ch. 4, § 4.22.1, available at www.cms.hhs.gov/manuals/downloads/pim83c04.pdf. As explained by the OIG, the anti-kickback law "makes it illegal to offer, pay, solicit or receive anything of value as an inducement to generate business payable by Medicare or Medicaid." Department of Health and Human Services, *Publication of OIG Special Fraud Alerts*, 59 F.R.65372, 65375 (Dec. 19, 1994). Therefore, "[w]hen providers, practitioners or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them." *Id.* According to OIG, one "[i]ndication of [i]mproper [w]aiver of [d]eductibles and [c]opayments" is "charges to Medicare beneficiaries which are higher than those made to other persons for similar services and items (the higher charges offset the waiver of coinsurance)." *Id.*

These provisions make clear that a waiver of co-insurance, as alleged in Paragraph 27, qualifies as a "renumeration" that potentially violates § 1320a-7b(b)(1) or (2). The question is whether Relator has alleged that the renumeration had, as at least one of its purposes, the purpose of inducing the relevant patient to purchase services from EOOC. *See McClatchey*, 217 F.3d at 835 ("[A] person who offers or pays renumeration to another person violates the Act so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals").[20] In this case,

_____

[20] Although *McClatchey* involved § 1320a-7b(b)(2)(A) (wrongful inducement of referrals) as opposed to § 1320a-7b(b)(2)(B) (wrongful inducement of purchase of goods or services), the reasoning and test adopted in *McClatchey* extends equally to the inducement of purchase of goods or services.

Relator has not alleged that EOOC provided the waiver for the purpose of inducing the patient to purchase services. Instead, the only allegation regarding EOOC's purpose in providing the waiver is Relator's implication that EOOC intended to provide a special benefit to EOOC employees and their family members, who were already existing EOOC patients. While the allegations are sufficient to state a claim for submission of a false claim, they are not sufficient to state a claim for a "kickback" because they lack the necessary element of purpose, *i.e.*, that EOOC acted with at least one purpose of inducing certain patients to give them their business. Accordingly, the Court finds that Relator's theory of FCA liability premised on the anti-kickback provisions fails as a matter of law.[21]

## VI.    Retaliation Claim

The FCA has a whistleblower protection provision, which prohibits retaliatory discharges and provides: "Any employee who is discharged [or] demoted . . . by his or her employer because of lawful acts done by the employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h). A whistleblower must show, by a preponderance of the evidence, that the employer's retaliatory actions resulted because of the whistleblower's participation in a protected activity. *Sikkenga*, 472 F.3d at 729. The "because" standard requires a relator to demonstrate: (1) the employer had knowledge the employee was engaged in protected activity, and (2) the retaliation was motivated,

---

[21] Because the Court finds that Relator's allegations do not give rise to a violation of the anti-kickback provisions, the Court does not reach the question of whether such violation is actionable as an FCA claim under a false certification theory. *See Conner*, 543 F.3d at 1223 (failing to reach question of whether violations of the anti-kickback statute are actionable through the FCA because relator failed to allege a "kickback" within the meaning of the statute).

at least in part, by the employee's engaging in protected activity. *Sikkenga*, 472 F.3d at 729. As to

the first element, which is the disputed element for purposes of this motion, a whistleblower "has

the burden of pleading facts which would demonstrate that defendants had been put on notice that

plaintiff was either taking action in furtherance of a private qui tam action or assisting in an FCA

action brought by the government." *United States ex rel. Ramsmeyer v. Century Healthcare Corp.*,

90 F.3d 1514, 1522 (10th Cir. 1996). It is not necessary that the whistleblower actually file a qui

tam action in order to maintain a claim; however, the activity prompting the discharge must have

been taken in furtherance of an FCA enforcement action. *Id.*

> Regarding her retaliation claim, Realtor alleges:
>
> [Relator] provided information to Defendant that put them on notice that they were engaging in *illegal and fraudulent practices* in violation of Medicare and Medicaid regulations and demanded that the practices be stopped. The information provided by Ms. Sharp put the Defendant on notice that she was *pursuing an investigation* into the practices she complained of and, therefore, she was engaged in a protected activity as contemplated by the False Claims Act. [Relator] was terminated in retaliation for her good-faith report of wrongdoing.

(FAC ¶¶ 67-69 (emphasis added).) More specifically, Relator alleges that she "brought her concerns

about the Defendant's billing practices, and that they were committing fraud on Medicare and

Medicaid, to management on October 5, 2004." (*Id.* ¶ 29.)

The Court finds these allegations sufficient as to the notice requirement, despite the fact that

she does not allege to have explicitly informed EOOC that her "investigation" was for purposes of

an eventual FCA lawsuit. This is not required to put an employer on notice that an employee is

engaging in protected FCA activity. *See United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d

731, 739-40 (D.C. Cir. 1998) (holding that, because there is no requirement that a plaintiff know his

investigation could lead to an FCA claim, "there likewise can be no requirement that he suggest to

defendant that he is contemplating such an action" and that defendant must merely know that the plaintiff is engaged in "activity that reasonably could lead to a False Claims Act case"). Here, Relator alleges to have used the words "committing fraud" and "fraudulent" and even "illegal." Such words are sufficient to allege that EOOC was on notice that Relator was conducting or had completed an investigation that could lead to FCA litigation.[22]

## VII.    Conclusion

Defendant Eastern Oklahoma Orthopedic Center's Motion to Dismiss the First Amended Complaint (Doc. 43) is GRANTED IN PART AND DENIED IN PART. Following is a breakdown of the Court's rulings as to each cause of action:

First Cause of Action - DENIED
Second Cause of Action - DENIED
Third Cause of Action - DENIED
Fourth Cause of Action - GRANTED
Fifth-Eighth Causes of Action - GRANTED pursuant to voluntary dismissal/abandonment
Ninth Cause of Action - DENIED

Following is a breakdown of the Court's rulings as to each relevant Paragraph of the FAC:

Paragraph 18(a)(i) - DENIED
Paragraph 18(a)(ii)-(iv) - GRANTED pursuant to voluntary dismissal/abandonment
Paragraph 19(a),(b) - DENIED
Paragraph 19(c) - GRANTED

---

[22] Both cases cited by EOOC are unpersuasive because they involved employees whose job responsibilities included fraud detection. Such employees are subject to a heightened notice requirement, which requires them to "make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." *Id.* at 1523 n.7; *see also Fanslow v. Chicago Mf'g Ctr., Inc.*, 384 F.3d 469, 484 (7th Cir. 2004) (identifying Tenth Circuit as circuit that has adopted "a heightened notice requirement for employees who are charged with investigating fraud" and finding that district court committed error by holding normal employee to any heightened notice requirement). Relator is a Front Desk Supervisor, and there is no contention that she had job responsibilities related to fraud detection.

Paragraph 21 - DENIED
Paragraph 22 - GRANTED
Paragraph 23 - DENIED
Paragraph 24 - GRANTED
Paragraph 25 - DENIED
Paragraph 26 - GRANTED pursuant to voluntary dismissal/abandonment
Paragraph 27(g)-(r) - GRANTED
Paragraph 27(a)-(f) - GRANTED as to anti-kickback theory of liability, DENIED in all other respects

The parties are ORDERED to submit a Joint Status Report no later than two weeks from the date

of entry of this Order.

   **It is so ordered this 27th day of February, 2009.**


_____
**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

49