**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. BRENDA L. SHARP, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | )   **Case No. 05-CV-572-TCK-TLW** ) |
| EASTERN OKLAHOMA ORTHOPEDIC CENTER, | ) ) ) |
| Defendant. | ) ) |

## OPINION AND ORDER

Before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. 215) and Defendant's Motion for Summary Judgment (Doc. 213).

**I.      Background and Procedural History**

Brenda Sharp ("Relator") filed this qui tam action on behalf of the United States of America pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et. seq*., against Defendant Eastern Oklahoma Orthopedic Center ("EOOC").[1]  EOOC is an orthopedic medical practice comprised of fourteen physicians in Tulsa, Oklahoma.  Relator was previously employed as EOOC's Front Desk Supervisor until she was terminated in May 2005.  In this position, Relator's duties included day-to-day scheduling, maintaining demographics of patients, checking patients in and out, cashiering, and supervising other employees.  In the course of performing these duties, Relator alleges to have witnessed several practices by EOOC that violated the FCA.

---

[1]  The FCA authorizes private citizens to assert FCA claims on behalf of the United States.  31 U.S.C. § 3730(b).  These actions are known as qui tam actions, with the private citizen or "relator" acting "for the person and for the United States government against the alleged false claimant."  *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 706 n.3 (10th Cir. 2006) (internal quotation marks omitted).

Relator has four remaining causes of action: (1) presentation of false claims to the government, in violation of 31 U.S.C. § 3729(a)(1); (2) making or using a false record or statement to get a false claim paid or approved by the government, in violation of 31 U.S.C. § 3729(a)(2); (3) making or using a false record or statement to conceal, avoid, or decrease an obligation to pay the government, in violation of 31 U.S.C. § 3729(a)(7); and (4) retaliatory discharge.[2]  With respect to the first three FCA claims, Relator asserts that four specific practices by EOOC resulted in FCA violations: (1) upcoding preoperative examinations; (2) miscoding of follow-up visits where such visits were solely for data collection and were not medically necessary;[3] (3) waiving Medicare co-insurance and deductibles for certain patients; and (4) billing patient accounts involving worker's compensation and liability claims to Medicare, instead of billing such amounts to any primary insurance first, resulting in violations of the Medicare Secondary Payer ("MSP") rules.[4]  On April

---

[2]  Relator voluntarily dismissed her state law claims, which comprised the fifth, sixth, seventh, and eighth causes of action in the First Amended Complaint.  (*See* Pl.'s Resp. Def.'s Mot. to Dismiss at 37-38 (Doc. 47).)  On February 27, 2009, the Court issued an Opinion and Order (Doc. 56) granting in part and denying in part EOOC's Motion to Dismiss the First Amended Complaint (Doc. 43).  The Opinion and Order dismissed Relator's claim for violation of Medicare's anti-kickback provision.

[3]  In her First Amended Complaint, Plaintiff claimed "Dr. [Rodney] Plaster would schedule periodic follow-up visits with the patients to gather data to be used in the studies and would bill Medicare even though it was not medically necessary or supported by the dictation provided by Dr. Plaster."  (First Am. Comp. at ¶ 21.)  Plaintiff has since conceded that the follow-ups were medically necessary and, thus, has abandoned that portion of her claim related to clinical studies.  (*See* Pl.'s Mot. for Partial Summ. J. at 25.)

[4]  On September 7, 2012, Relator filed a Motion to Amend the Pleadings (Doc. 338) requesting leave to amend the First Amended Complaint to allege additional violations of the FCA related to preoperative examinations.  In particular, Relator claimed EOOC violated the FCA by submitting claims to Medicare without including the appropriate ICD-9-CM V-codes (the "V-code claim").  The Court denied Relator's Motion to Amend on February 28, 2013 (Doc. 388). Accordingly, the Court has not considered the arguments made by Relator or EOOC in their respective motions for summary judgment regarding the V-code claim.

13, 2012, after several years of discovery, EOOC filed a Motion for Summary Judgment, and Relator

filed a Motion for Partial Summary Judgment.

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and

the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving

party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite*

*Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006).  The Court resolves all factual disputes and

draws all reasonable inferences in favor of the non-moving party. *Id*.  However, the party seeking

to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but

must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The party seeking to overcome a motion for summary judgment must also make a showing sufficient

to establish the existence of those elements essential to that party's case. *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323-33 (1986).  The relevant legal standard does not change where the parties

file cross motions for summary judgment, and each party has the burden of establishing the lack of

a genuine issue of material fact and entitlement to judgment as a matter of law. *See Atl. Richfield*

*Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

## III.    FCA Background

As a general matter, "[t]he FCA covers all fraudulent attempts to cause the government to pay

out sums of money." *United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1217

(10th Cir. 2008) (internal quotation marks omitted).  At all relevant times, the FCA prohibited:

(1)     knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the
        United States Government . . . a false or fraudulent claim for payment or approval;
(2)     knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or
        statement to get a false or fraudulent claim paid or approved by the Government;

3

. . .

(7)     knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government[.]

31 U.S.C. § 3729(a)(2008).  Section 3729(a)(1) prohibits the presentation of false or fraudulent claims to the government for payment.  To establish a violation of Section 3729(a)(1), a relator "must show by a preponderance of the evidence that: (1) a false or fraudulent claim (2) is presented to the United States for payment or approval (3) with knowledge that the claim is false or fraudulent." *United States ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1315 (W.D. Okla. 1998).

Section 3729(a)(2) prohibits the making or using of false records or statements in an attempt to get a false claim paid by the government.  *See Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F. 3d 519, 531 (10th Cir. 2000) ("Under § 3729(a)(2), liability is premised on the presentation of a false record or statement to get a false or fraudulent claim paid or approved.") (internal quotation marks omitted). A relator may establish a violation of § 3729(a)(2) by showing: "(1) a false record or statement (2) is used to cause the United States to pay or approve a fraudulent claim (3) with the defendant's knowledge of the falsity of the record or statement." *Trim*, 31 F. Supp. 2d at 1315.

Section 3729(a)(7) prohibits making a false record or statement in attempt to avoid paying the government what it is owed; this type of violation is referred to as a "reverse false claim." *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1194 (10th Cir. 2006) (explaining that § 3729(a)(7) is a reverse false claim provision because the "financial obligation that is the subject of the fraud flowed in the opposite of the usual direction") (internal quotation marks omitted); *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004) (describing § 3729(a)(7) as the "reverse False Claims Act subsection," and explaining that "[i]n a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but

4

instead results in no payment to the government when a payment is obligated"). The elements of a reverse false claim are: "(1) that the defendant made, used, or caused to be used a record or statement to conceal, avoid, or decrease an obligation to the United States; (2) that the statement or record was false; (3) that the defendant knew that the statement or record was false; and (4) that the United States suffered damages as a result." *Wilkins ex rel. United States v. State of Ohio*, 885 F. Supp. 1055, 1059 (S.D. Ohio 1995).

The Tenth Circuit has acknowledged that the FCA "recognizes two types of actionable claims – factually false claims and legally false claims." *Conner*, 543 F.3d at 1217. In a "factually false" case, "proving falsehood is relatively straightforward: A relator must generally show that the payee has submitted an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.* (internal quotation marks omitted). In a "legally false" case, "the relator must demonstrate that the defendant has certified compliance with a statute or regulation as a condition to government payment, yet knowingly failed to comply with such statute or regulation." *Id.* (internal quotation marks omitted).

The knowledge requirement, which is an essential element of all types of violations alleged by Relator, is defined by statute. "Knowing" and "knowingly" mean "that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b). Based on this knowledge requirement, it is settled law that "[a] mere violation of a regulatory provision, in the absence of a knowingly false or misleading representation, does not amount to fraud." *Trim*, 31 F. Supp. 2d at 1315. "For a statement to be knowingly false, it must be more than merely an innocent

mistake or misinterpretation of a regulatory requirement."  *Id.*; *see also United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir. 2002) ("[I]nnocent mistakes and negligence are not offenses under the [FCA]."); *Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (explaining that "[i]nnocent mistake" and "negligence" do not satisfy the FCA's knowledge requirement and that "[t]o take advantage of a disputed legal question . . . is to be neither deliberately ignorant nor recklessly disregardful").

## IV.    Medicare Background

Medicare is "a system of health insurance administered by the United States Department of Health and Human Services, through the Center for Medicare and Medicaid Services (CMS)." *United States v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1351 (11th Cir. 2005).  CMS coordinates reimbursement for Medicare claims by "contracting with private insurance carriers throughout the United States to administer and pay claims within their regions . . . ." *Id.*  Providers submit their claims using "HCFA 1500" forms.  "HCFA forms serve as invoices for billing Medicare and Medicaid: they must contain the doctor's name, the patient's name, the dates services were provided, and a five-digit code identifying each service provided to a particular patient, called a 'CPT code.'" *United States v. Krizek*, 192 F.3d 1024, 1026 (D.C. Cir. 1999).  "In 1992, the CPT code book was revised to introduce 'evaluation and management codes' to cover non-procedure, non-surgical oriented services." *United States v. Krizek*, 859 F. Supp. 5, 10 n.2 (D.C. Cir. 1994).  Evaluation and management ("E/M") services provided to existing patients are billed using one of five CPT codes: 99211, 99212, 99213, 99214, or 99215.  *United States ex rel. Freedman v. Suarex-Hoyos*, 781 F. Supp. 2d 1270, 1274 (M.D. Fla. 2011).  CPT code 99214 should be used for an

> office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: A detailed history; A

6

detailed examination; Medicare decision making of moderate complexity. . . . Physicians typically spend 25 minutes face-to-face with the patient and/or family.

(Ex. 138 to Pl.'s Resp.)  CPT code 99215 has the same requirements as code 99214, except that the Medicare decision making must be of "high complexity," and a physician typically spends 40 minutes face-to-face with the patient and/or family.  (Ex. 139 to Pl.'s Resp.)

## V.      Analysis of the Parties' Cross-Motions for Summary Judgment

EOOC requests summary judgment on all remaining claims.  As to violations of §§ 3729(a)(1), (2), and (7), EOOC argues that none of the four practices described by Relator result in liability under the FCA.  EOOC also seeks summary judgment on the retaliatory discharge claim. Relator requests summary judgment on her claims arising under §§ 3729(a)(1), (2), and (7) but does not seek summary judgment on her retaliatory discharge claim.

The Court will address whether either party is entitled to summary judgment as to the four specific practices supporting the FCA claims: (1) upcoding preoperative visits; (2) miscoding follow-up visits; (3) waiving co-insurance; and (4) violating MSP rules.  The Court will then address whether EOOC is entitled to summary judgment on the retaliatory discharge claim.

### A.      Upcoding Preoperative Visits

Relator argues EOOC presented factually false claims by failing to assign the correct CPT code to preoperative examinations.  She alleges that "pre-operation patient visits were being up-coded by [EOOC] in that appointments were being marked at a higher level than the time actually spent with patients." (First Am. Comp. ¶ 23.)  Specifically, Relator contends EOOC assigned codes 99214 and 99215 to visits, even when the nature of the preoperative examinations did not support the use of such codes.  Such claims allegedly violated both §§ 3729(a)(1) and 3729(a)(2) of the FCA.

7

In the First Amended Complaint, Relator provides four specific examples of preoperative visits which she alleges have been upcoded, including visits by Alice W., Betty E., Della W., and Mary B. (First Am. Compl. ¶ 23.) However, at the summary judgment stage, Relator has provided no evidence to support her allegations that false claims were submitted for any of the four patients identified in the First Amended Complaint. Instead, the only false claim Relator has provided pertains to one preoperative examination of Relator's aunt, and the Court's analysis is limited to this false claim. Both Relator and EOOC have moved for summary judgment.[5]

**1.    Falsity**

As Front Desk Supervisor, Relator did not typically directly observe or participate in preoperative examinations. (B. Sharp Depo., Ex. 8 to Def.'s Br. Summ. J., at 475:6-20.) However, Relator was present outside the examination room during the preoperative examination of her aunt. At this time, Relator observed that the physician was only in the room for five minutes and recalls her aunt commenting that the visit only lasted five minutes. (*Id.* at 525:1-527:11, 534:9-19.) The encounter form for her aunt's preoperative examination was coded using 99214 (*see* Ex. 34 to Pl.'s Resp.), a code that should be used where the physician spends twenty-five minutes with the patient, *see supra* Part IV.

The encounter form for this visit, when accompanied by the testimony of Relator, raises a genuine issue of material fact as to whether or not the aunt's preoperative visit would have qualified to be coded using a 99214 CPT code. This is sufficient to create a question of fact regarding whether

---

[5] Relator seeks summary judgment on her upcoding claim on the basis that EOOC failed to include the appropriate V-codes on the claim forms for preoperative examinations. As discussed *supra* note 4, the Court did not permit Relator to amend the First Amended Complaint to add the V-code theory. Accordingly, the Court will not consider any arguments made based on the V-codes, and Relator's request for summary judgment on her upcoding claim is denied as moot.

8

EOOC submitted at least one false claim for an upcoded preoperative examination.[6]  As explained above, Relator has offered no evidence to support her contention that EOOC submitted false claims for any other patients under her preoperative upcoding theory.  Therefore, Relator's preoperative upcoding theory is limited to this single potential false claim, her aunt's preoperative visit.

##   2.   Knowledge[7]

To satisfy the knowledge element of her upcoding claim, Relator must prove that EOOC had actual knowledge of the falsity of Relator's aunts preoperative examination claim or acted in deliberate ignorance or reckless disregard of the truth or falsity of such preoperative examination claim.  *See* 31 U.S.C. § 3729(b).  Neither an innocent mistake nor negligence are sufficient to prove that a statement was knowingly false.  *See Trim*, 31 F. Supp. 2d at 1315; *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir. 2002).

Relator concedes she has no evidence of what knowledge a given employee had at the time the paperwork for preoperative examinations was completed.  (*See* Pl.'s Resp. at 66.)  However, Relator has offered testimony from several EOOC employees regarding their general knowledge of preoperative examinations, what was required for 99214 or 99215 codes, and that EOOC physicians were not spending sufficient time to qualify for these codes.  For example, EOOC patient account representative Rhonda Vera, EOOC staff member Cynthia Pratt, and EOOC medical assistant Cindy Pollard were aware that EOOC physicians were spending less than five minutes with patients during the preoperative examinations and that patients were complaining about bills.  (R. Vera Depo., Ex.

_____

[6]  A qui tam relator may survive summary judgment so long as relator has evidence of at least one false claim in hand.  *See United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006).

[7] Neither Relator nor EOOC dispute the second element of the FCA claims under §§ 3729(a)(1) and (2)  – that EOOC submitted claims to the government for payment.

17 to Pl.'s Resp., at 49:17-50:3 ("And the patients were getting upset for being billed at Level 5 when they didn't see the doctor for maybe two minutes at the most."); C. Pratt Depo., Ex. 36 to Pl.'s Resp., at 64:18-66:21 ("But I started getting questions from patients at EOOC about why their preop charges would be this much or whatever, and 'He only seen [sic] me for five minutes, you know. How could he get all of that in five minutes?' And they were complaining."); C. Pollard Depo., Ex. 37 to Pl.'s Resp., at 153:22-154:25 ("Basically come in and shake hands and we'll see you at surgery, that type of thing.").) Relator has also presented evidence that Vera spoke with a Medicare representative regarding her concerns that preoperative visits were being improperly coded:

> Q.     Did you talk with him about pre-ops?
>                          . . .
> A.     We talked about – yes we did.  It was a Level 5 pre-op visit and they were only basically seeing the – what do you call the – a – their helpers?
>
> Q.     Physician's assistant.
>
> A.     Yes, thank you.  Their physician's assistants, and the doctors would walk in and say, "Everything okay?" and walk back out.  And the patients were getting upset for being billed at Level 5 when they didn't see the doctor for maybe two minutes at the most.

(R. Vera Depo., Ex. 17 to Pl.'s Resp., at 49:17-50:3.)  This testimony is sufficient to allow a reasonable jury to conclude that EOOC had knowledge that preoperative examinations were routinely improperly coded due to insufficient time spent with a physician, such that Relator's aunt's encounter form could be considered a knowing false claim.

Relator also moved for summary judgment on the preoperative upcoding theory, arguing that no genuine issue of material fact exists and that she is entitled to judgment as a matter of law. However, the Court finds that Relator's evidence is not so conclusive as to entitle her to summary

judgment; instead, genuine issues of fact exists regarding the upcoding theory, and Relator's request for summary judgment is denied.

### B.     Miscoding Follow-up Visits

Relator argues that EOOC submitted factually false claims because the claim forms for follow-up visits by one particular EOOC physician, Dr. Rodney Plaster, misstated the services provided at the visits.   Specifically, Relator contends that Dr. Plaster checked the status of asymptomatic prosthetic implants during follow-up visits but used the diagnosis code for degenerative joint disease on the claim forms.   Relator argues this happened because Dr. Plaster "couldn't be bothered to code" and had no knowledge of how to code such visits.  (Pl.'s Resp. at 82.) Both Relator and EOOC moved for summary judgment on this theory.[8]

### 1.     Falsity

Dr. Plaster, an orthopedic surgeon at EOOC, specializes in performing total knee and total hip replacements using artificial knee and hip joints in patients with degenerative disc disease.  (R. Plaster Depo., Ex. 25 to Def.'s Br. Summ. J., at 5:23-6:1.)  Following joint replacement surgery, Dr. Plaster sees his patients for follow-up visits.  (*Id.* at 69:2-4.)  The HCFA1500 forms for Dr. Plaster's follow-ups identify "degenerative joint disease" as the primary diagnosis for the visit.  (*See, e.g.*, Ex. 32 to Def.'s Br. Summ. J.; Ex. 83 to Pl.'s Resp.)  According to Dr. Plaster, the installation of a prosthesis does not cure degenerative joint disease; instead, further evaluation and management of the disease is required even after implantation of a prosthesis.  (R. Plaster Depo., Ex. 25 to Def.'s Br. Summ. J., at 73:20-24; R. Plaster Dec., Ex. 6 to Def.'s Reply, at ¶¶ 4-5.)

---

[8]     Relator has not indicated whether this theory falls under § 3729(a)(1) or § 3729(a)(2).  For reasons explained below, this theory fails under either section.

A reasonable jury could not find in favor of Relator on the falsity element of her follow-up theory. Ultimately, the degenerative joint disease is the underlying reason why the patients required a prosthetic joint, and there is nothing factually false about Dr. Plaster's coding the visits as "degenerative joint disease." The discrepancies between the dictation – indicating that the patient is returning following joint replacement surgery – and the diagnosis code for degenerative joint disease on the encounter form are not inconsistent and do not indicate that the claim forms were false or misleading in any manner. Therefore, EOOC is entitled to judgment as to Relator's miscoding of follow-up visits theory of liability.

### C.      Wavier of Co-Insurance

Relator contends that EOOC incorrectly classified one particular individual, Patient 188582, as an "insurance only" patient and did not collect coinsurance or deductibles from this patient for his visits.[9]   In doing so, Relator argues EOOC violated §§ 3729(a)(1) and (2) of the FCA by misrepresenting the actual charges EOOC incurred for Patient 188582's visits.  Both EOOC and Relator moved for summary judgment on this theory.

### 1.      Falsity

A "provider, practitioner, or supplier who *routinely* waives Medicare copayments or deductibles is misstating its actual charge;" therefore, a false claim can result from this practice. Department of Health and Human Services, *Publication of OIG Special Fraud Alerts*, 59 Fed. Reg.

---

[9]  In Exhibit 98 to Plaintiff's Response to Defendant's Motion for Summary Judgment, Relator provides the Court with a list of other patients that were treated as "insurance only."  However, unlike the undisputed evidence provided as to Patient 188582, Relator does not provide any evidence of (1) whether those patients were covered by Medicare or private insurance; or (2) whether any of those patients had a financial hardship which would necessitate their classification as "insurance only."  Without such evidence, Exhibit 98 has no evidentiary value in relation to this theory.  Therefore, the Court's analysis is limited to Patient 188582.

65372, 65374-75 (Dec. 19, 1994) (emphasis added).  Further, in a section entitled "Applying Criteria

for Reasonable Charge Determination," the Medicare Claims Processing Manual provides:

> Physicians or suppliers who *routinely* waive the collection of deductible or coinsurance from a beneficiary constitute a violation of the law pertaining to false claims and kickbacks. . . .  Deductible and coinsurance amounts are taken into account (included) in determining the reasonable charge for a service or item.  In this regard, a billed amount that is not reasonably related to an expectation of payment is not considered the "actual charge" for the purpose of processing a claim or for the purpose of determining a customary charge.

*Medicare Claims Processing Manual*, Ch. 23, § 80.8.1 (emphasis added), available at

www.cms.hhs.gov/manuals/downloads/clm104c23.pdf.   When this type of false claim occurs,

Medicare pays more than it should for a particular visit.  *See* 59 Fed. Reg. at 65475 (providing the

following example of a false claim: "If a supplier claims that its charge for a service is $100, but

routinely waives the co-payment, the actual charge is $80.  Medicare should be paying 80% of $80

(or $64), rather than 80% of $100 (or $80).")[10]

    Relator has offered sufficient evidence to permit a reasonable jury to conclude that EOOC

submitted false claims by failing to disclose that it routinely waived the coinsurance and deductibles

for Patient 188582, while knowing that he did not have any financial hardship.[11]   EOOC used a

computer software system to classify patients by "type" based on certain characteristics, including

whether the patient had private insurance or participated in Medicare.  (R. Smith Depo., Ex. 6 to

---

[10]   If a Medicare Part B carrier determines that a claim is compensable, the provider does not receive reimbursement for the full amount of its actual charge.  Instead, Medicare pays 80% of what it determines to be a reasonable charge for the services provided.  42 U.S.C. § 1395l(a)(1).

    The parties dispute whether Medicare actually paid any more for Patient 188582's visits than it would have if EOOC disclosed the waivers of coinsurance and deductibles.  (*See* Pl.'s Resp. at 93.).  However, such fact has no bearing on whether or not the claims submitted by EOOC were factually false under the FCA.  *See* 59 Fed. Reg. at 65374-75.

[11]  The parties do not dispute that Patient 188582 had no financial hardship.

Def.'s Br. Summ. J., at 80:5-16; D. Poston Depo., Ex. 34 to Def.'s Br. Summ. J., at 13:24-14:21.) Patient 188582 was classified as Patient Type 25, "Insurance Only," while he was on private insurance.  (T. Emel Depo., Ex. 5 to Def.'s Br. Summ. J., at 30:11-23, 31:5-19.)  After Patient 188582 changed from private insurance to Medicare, he incorrectly remained classified as a Patient Type 25; therefore, EOOC did not collect co-payments, coinsurance, or deductibles for Patient 188582's visits after this time. (D. Poston Depo., Ex. 34 to Def.'s Br. Summ. J., at 26:3-28:4.) Therefore, EOOC submitted false claims on behalf of this patent and misstated the charge it incurred for each of Patient 188582's visits, regardless of whether Medicare paid more as a result of the false claims or not.[12]

### 2.    Knowledge

EOOC disputes whether it had knowledge of the misclassification or whether it made an innocent error.  (*See* Def.'s Br. Summ. J. at 78 ("If EOOC intended to categorize this patient as Insurance Only once he became a Medicare beneficiary, the proper code would have been Patient Type 52 (Medicare Insurance Only), not Patient Type 25 (Insurance Only).").)  In contrast, Relator contends Patient 188582 was purposely classified as Patient Type 25 at the direction of Dr. Emel. (Pl.'s Resp. at 32.)

No question of material fact exists regarding whether EOOC acted with the requisite knowledge as to the misclassification of this patient.  Although Relator argues that Patient 188582 was purposely classified as "insurance only" by Dr. Emel, she has absolutely no evidentiary support

---

[12]  In its Motion, EOOC argues that Relator cannot establish any "routine" waiver of deductibles or coinsurance by EOOC because Relator can only demonstrate that EOOC waived deductibles and coinsurance for one patient.  However, as this Court held in its Opinion and Order of February 27, 2009 (Doc. 56), such a waiver may be routine even where it only involves one patient.

for this argument. Dr. Emel testified that he knew Medicare prohibited its beneficiaries from being classified as "insurance only" and, as a result, he "didn't check the box on the charge ticket saying 'insurance only' if they were Medicare patients." (T. Emel Depo., Ex. 5 to Def.'s Br. Summ. J. at 26:7-16; 50:15-18.) Dolores Poston, a patient account representative who handled Patient Type 25 patients, testified only to the general procedure by which a patient is classified as Patient Type 25 and did not indicate whether Dr. Emel or anyone else told her to classify Patient 188582 as insurance only while he was on Medicare. (D. Poston Depo., Ex. 13 to Pl.'s Resp., at 26:20-27:22.) Additionally, Drs. Browne and Boone cannot recall classifying any Medicare patients as "insurance only." (C. Browne Depo., Ex. 24 to Def.'s Br. Summ. J. at 33:19-21 ("As far as I know, I have never given an insurance only to a Medicare patient."); B. Boone Depo., Ex. 9 to Def.'s Br. Summ. J. at 14:4-9.) Thus, neither Dr. Emel nor Ms. Poston have any recollection of Dr. Emel making a specific decision to maintain this patient as "insurance only," particularly *after* Patient 188582 became a Medicare beneficiary. Without evidence of something more than a mere oversight in failing to change the status of this patient, a reasonable jury could not find that EOOC acted with the requisite knowledge. *See Trim*, 31 F. Supp. 2d at 1315 ("A mere violation of a regulatory provision, in the absence of a knowingly false or misleading representation, does not amount to fraud.").

### D.     Violation of MSP Rules

Relator argues EOOC violated §§ 3729(a)(1) and (2) of the FCA by billing patient accounts involving worker's compensation and liability claims to Medicare as "a payer of first resort," instead of billing such accounts to any available primary insurance first. (First Am. Comp. ¶ 25.) This practice allegedly resulted in the submission of false claims because EOOC "failed to disclose the existence of a primary plan to Medicare" and because EOOC's "employees knowingly submitted

15

these claims with Medicare as the primary payer." (*Id.*)  Relator's theory encompasses twenty-four

patients, one involving a worker's compensation claim and the others relating to accidents.  All

alleged false claims related to violation of the MSP rules were submitted prior to 2003.  Both Relator

and EOOC moved for summary judgment on this theory.[13]

## 1.    § 3729(a)(1) and (2)

### a.    Falsity

Relator's falsity theory rests primarily on EOOC's failure to complete "Box 11" on the

Medicare claim forms, which asks the medical provider to identify other available insurance.

However, the Court finds that such failure did not result in false claims for several reasons.  First,

at relevant times to this theory of recovery, the MSP regulations were ambiguous.[14]  One portion of

the regulations offering guidance on how to bill claims involving a Medicare patient who might also

be covered by automobile or other liability insurance provided:

> § 411.54 Limitation on charges when a beneficiary has received a liability insurance
> payment or has a claim pending against a liability insurer.
> . . .
> (c) *Basic rules* –
> . . .
>      (2) *Specific limitations.*  Except as provided in paragraph (d) of this section,
> the provider or supplier –
>            (I) May not bill the liability insurer or place a lien against the
> beneficiary's liability insurance settlement for Medicare covered services.
>            (ii) May only bill Medicare for Medicare-covered services . . . .

42 C.F.R. § 411.54 (2002).  This regulation advised providers to bill Medicare and *not* liability

insurers.  However, another regulation in effect at the time required Medicare providers to agree

---

[13]  This theory of FCA liability implicates §§ 3729(a)(1), (2), and (7), and the Court will
address each claim.

[14]  The MSP Manual released in 2003 clarified these ambiguities.

"[t]o bill other primary payers before billing Medicare except when the primary payer is a liability insurer . . . ." *Id.* § 489.20(g) (2002). These two regulations arguably contradict one another: one prohibits medical providers from billing the liability insurer, while the other requires providers to bill liability insurers.

Second, EOOC employees had sought guidance as to these ambiguities and believed they were in compliance. Robin Smith, EOOC's Administrator and Compliance Officer, and Carolyn Tinsley, an EOOC employee who handled billing for some cases involving liability insurers, testified that they asked Medicare or the regional Medicare contractor for guidance when they had questions about MSP issues. (R. Smith Depo., Ex. 6 to Def.'s Br. Summ. J., at 93:18-94:2; Depo. of C. Tinsley, Ex. 38 to Def.'s Br. Summ. J., at 170:5-22, 173:7-12.) Smith testified that "[a]t the time, [Medicare] w[as] subrogating claims and we, as long as we informed them it was a motor vehicle accident, we filed the claim to [Medicare] rather than pursue any other form of payment. We had the option." (R. Smith Depo., Ex.6 to Def.'s Br. Summ. J., at 88:7-15, 97:6-14.) "[W]hat she told me was it was never wrong to file a claim with [Medicare]. I could file a claim to them at any time number one." (*Id.* at 94:23-95:7.)

Third, EOOC did complete Box 10 on the Medicare claim forms, which asks the provider whether the patient's condition is related to employment, an automobile accident, or other accident. It is undisputed that EOOC completed Box 10 for each of the twenty-four patients at issue, thereby notifying Medicare of the possibility of another payer. (*Id.* at 113:15-114:15.) Fourth, one reason that EOOC did not complete Box 11 was because EOOC could not be certain that any other payers existed. Business Office Manager Melissa Turner ("Turner") testified that EOOC financial counselors would speak with patients who had been involved in an accident and obtain information regarding *possible* payers. (M. Turner Depo., Ex. 36 to Def.'s Br. Summ. J., at 104:13-23.)

17

However, neither the financial counselor nor the patient could determine who was at fault for the accident; instead, the insurance companies made the liability determination. (*Id.*) Finally, Relator's own expert, Stephanie Womack, agreed that by checking Box 10, EOOC placed Medicare on sufficient notice of the existence of another potential payer. (S. Womack Depo., Ex. 2 to Def.'s Br. Summ. J., at 266:24-267:7.)[15]

Given the confusion regarding the MSP regulations, EOOC's attempts at compliance, EOOC's completion of Box 10, EOOC's inability to know the identity of primary payers, and Relator's expert's admission that EOOC technically notified Medicare of the potential existence of primary payers by checking Box 10, a reasonable jury could not find that EOOC submitted any false claims based on Relator's MSP violation theory. *See United States v. Prabhu*, 442 F. Supp. 2d. 1008, 1027 (D. Nev. 2006) (noting that a defendant cannot be found to have submitted a false claim where "reasonable persons can disagree regarding whether the service was properly billed to the Government").

### b.    Knowledge

Alternatively, and for similar reasons, Relator has offered no evidence to show that EOOC had actual knowledge that it could not bill Medicare as a primary payer. Even when EOOC failed to complete Box 11 and identify the primary insurer – when the identity of such insurer was known – the Court does not find this act to constitute anything more than an honest mistake or mere negligence. *See United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190 (8th Cir. 2010) ("[A] statement that a defendant makes based on a reasonable interpretation of a statute

---

[15] EOOC filed a Motion to Exclude the Testimony and Report of Plaintiff's Proffered Expert Witness Stephanie Womack on April 23, 2012 (Doc. 238).  The Court has not ruled on this motion.  For purposes of this section of the Order only, the Court relies on Relator's expert's testimony and assumes such testimony is admissible.

cannot support a claim under the FCA if there is no authoritative contrary interpretation of that statute. This is because the defendant in such a case could not have acted with the knowledge that the FCA requires before liability can attach."); *Prabhu*, 442 F. Supp. 2d. at 1028-29 ("[T]he FCA knowledge standard does not extend to honest mistakes, but only to 'lies.' Thus, a Defendant does not 'knowingly' submit a 'false' claim when his conduct is consistent with a reasonable interpretation of ambiguous regulatory guidance."). EOOC's billing practices for MSP claims conformed to a reasonable interpretation of ambiguous regulations and such interpretation was supported by the regional Medicare contractor. Therefore, Relator has also failed to present sufficient evidence as to the knowledge element.

### 2. § 3729(a)(7)

Relator contends EOOC violated the FCA by retaining payments from Medicare after EOOC had been paid by the appropriate liability insurer, which also implicates § 3729(a)(7). (*See* First Am. Comp. ¶¶ 18, 33.) As explained above, § 3729(a)(7) requires Relator to demonstrate: (1) that EOOC made or used a record or statement to conceal, avoid, or decrease an obligation to the United States; (2) that the record or statement was false; (3) that EOOC knew the record or statement was false; and (4) that the United States suffered damages as a result. *See Wilkins*, 885 F. Supp. at 1059.

Relator has not come forward with sufficient evidence to support her § 3729(a)(7) claim. In her First Amended Complaint, Plaintiff identifies several patient accounts in which she believes EOOC failed to refund overpayments to Medicare. (*See* First Am. Comp. ¶ 18.) In its motion for summary judgment, EOOC submitted evidence demonstrating that any alleged overpayments by Medicare were refunded. (*See, e.g.,* Exs. 39 and 40 to Def.'s Br. Summ. J.) In response, Relator did not offer any further evidence creating a question of fact as to whether EOOC wrongfully retained

any overpayments related to these patients.  As with most of her claims, Relator simply has no evidence supporting her initial allegations, and EOOC is entitled to judgment as a matter of law.

### E.        Retaliatory Discharge

"Since employees will often be in the best position to report frauds perpetrated by their employers, the FCA includes 'whistleblower' provisions protecting employees who do so from retaliation."  *McBride v. Peak Wellness Center, Inc.*, 688 F.3d 698, 703-04 (10th Cir. 2012); 31 U.S.C. § 3730(h).  Section 3730(h) provides:

> Any employee who is discharged [or] demoted . . . by his or her employer because of lawful acts done by the employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in the action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. 3730(h).  The Tenth Circuit, quoting legislative history, has stated that this section provides relief "only if the whistleblower can show by a preponderance of the evidence that the employer's retaliatory actions resulted because of the whistleblower's participation in a protected activity." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 729 (10th Cir. 2006) (quoting S. Rep. No. 99–345, at 35 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5300).

The Tenth Circuit has not articulated a precise test for this claim, but the Court construes the above language from *Sikkenga* as requiring three elements: (1) the employee engaged in protected activity; (2) the employer had knowledge that the employee was engaged in protected activity; and (3) the employer retaliated against the employee because of this conduct.  *See id.*; *see also Harrington v. Aggregate Indus. Ne. Region, Inc.,* 668 F.3d 25, 31 (1st Cir. 2012) (adopting three-part test requiring "an employee to show that (i) he was engaged in conduct protected under the FCA;

20

(ii) the employer had knowledge of this conduct; and (iii) the employer retaliated against the employee because of this conduct"); *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012) (concluding that statutory language "states two basic elements: (1) acts by the employee 'in furtherance of' a suit under § 3730—acts also known as 'protected activity'; and (2) retaliation by the employer against the employee 'because of' those acts,'" but then dividing the second element into two parts inquiring as to knowledge and motivation).  Rather than adopt a two-part test with multiple components to the second part, the Court finds it simpler to state the elements as a three-part test.

### 1.     Protected Activity

In the FCA context, protected activity means "taking action in furtherance of a private qui tam action or assisting in an FCA action brought by the government." *McBride,* 688 F.3d at 705 (internal quotations omitted). "An employee need not actually file a qui tam action to qualify for whistleblower protection, but the activity prompting the [retaliatory action] must have been taken 'in furtherance of' an FCA enforcement action." *Id.* (internal quotations omitted).  An employee can be engaging in protected activity even if "the employee is not contemplating bringing a qui tam suit, is not even aware that there is such a thing as a qui tam action, and has no idea whether his . . . investigation or other acts, if made known to the government, might cause the Attorney General to sue his employer under the False Claims Act." *Schweizer*, 677 F.3d at 1238; *United States ex rel. Smith v. The Boeing Co.*, No. 11-7030, 2006 WL 542851, at *7 (D. Kan. Feb. 27, 2006) ("Most courts recognize that conduct can be 'in furtherance' of an FCA action if it involves investigation of matters that reasonably could lead to a viable False Claims Act case.").

Relator has presented evidence that, sometime before October 2005, Relator and Susan Kulla ("Kulla"), EOOC Director of Operations and Relator's supervisor, began investigating EOOC's billing practices to determine if specific billing practices were resulting in the submission of false Medicare claims.  (B. Sharp Depo., Ex. 2 to Pl.'s Resp., at 620-24.)  Neither Relator or Kulla were expressly charged in their job duties with Medicare compliance or detecting fraudulent activity.  This investigation led to a meeting with certain EOOC doctors ("October meeting"), which was scheduled and led by Kulla and in which Relator participated.  The Court finds, based on the summary judgment evidence, that these pre-October meeting activities could be considered protected activity by Relator.  The evidence reflects that Kulla and Relator were not merely concerned about regulatory compliance; they were concerned that factually false claims were being submitted to the government and pulled specific examples of those claims to discuss with the doctors.  (*Id.* at 620:22-25 ("Susan had the meeting, had us look at different things in the office to bring to the doctors that Robin was doing things improperly, sending claims to Medicare improperly.").)  These examples included instances in which patients were not being seen for the requisite amount of time to qualify for the code used and other intentional misstatements of fact.  (*Id.* at 623-24.) Although Relator did not use the words "false claim" or discuss the FCA during the October meeting, their initial investigation could be considered "in furtherance of" a qui tam action and was indeed the impetus for Relator's reporting false claims and instigation of this qui tam action.

Relator has also presented evidence that, from at least January 2005 until the date of her termination, she was engaged in external whistleblowing by reporting alleged fraudulent billing

practices directly to Medicare and/or its "Program Safeguard Contractor," AdvanceMed.[16]   For

example, in one letter to AdvanceMed, Relator stated:

> I have pulled a couple and made a copy of the dictation so you can see that Dr.
> Plaster does not mention anything about DJD 715.96 which is the diagnosis code that
> they used when the patient first came in to see the doctor prior to any surgery. . . .
> They are having no problems and are told the reason for the appointment is for the
> study program. . . . .The patient is told they will not be charged for the visit but the
> insurance company is being charged and this is unfair to you . . . .

(2/24/05 Letter, Ex. 130 to Pl.'s Resp.)  These allegations led directly to investigations into EOOC's

billing practices by AdvanceMed.  According to Relator, she was continuing to investigate and pull

files for submission to Medicare up to and including the date of her termination.  This external

whistleblowing directly to Medicare and/or its agent from January 2005 to the date of her

termination constitutes classic protected activity.

### 2.      Notice

"[A] plaintiff claiming retaliatory discharge under the FCA has the burden of pleading facts

which would demonstrate that defendants had been put on notice that plaintiff was [engaging in

protected activity]."  *McBride*, 688 F.3d at 705 (internal quotations omitted).  "Notice may be

provided in a number of ways: for example, by informing the employer of 'illegal activities' that

would constitute fraud on the United States; *by warning the employer of regulatory noncompliance

and false reporting of information to a government agency*; or by explicitly informing the employer

of an FCA violation."  *Id.* (internal citations omitted) (emphasis added).  Although some form of

notice is certainly required, an employee "does not have to alert his employer to the prospect of a

---

[16]  After Relator's report of fraudulent conduct to Medicare, she received a letter from Karen
Divens at AdvanceMed instructing her to direct all future communications to AdvanceMed.  (*See*
Ex. 126 to Pl.'s Resp.)

False Claims Act suit" because "§ 3730(h) does not require the employee to know that the investigation he was pursuing could lead to a False Claims Act suit." *Schweizer*, 677 F.3d at 1238.

The Tenth Circuit has indicated that if an employee's "regular duties include investigation of fraud, such persons must clearly plead notice to their employers of their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." *Sikkenga,* 472 F.3d at 729. However, if fraud investigation and detection is not part of the employee's typical job duties, she need not use "fraud" or any other specific language in order to put an employer on notice of their protected activity. *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 239 n.26 (1st Cir. 2004) ("Because [relator's] job duties did not involve investigating government payments or billings, he need not meet the heightened requirements for employees whose job descriptions do include such responsibilities in order to establish a § 3730(h) retaliation claim.") (abrogation on other grounds recognized by *United States ex. rel. Gagne v. City of Worcester*, 565 F.3d 40 (1st Cir. 2009)).

Relator's evidence is sufficient to create a question of fact as to whether at least one relevant decisionmaker[17] was aware that Relator was engaging in protected activity from on or around October 2005 until the date of her termination. First, Drs. Emel and Boone were present at the October meeting, during which Relator and others discussed the results of the internal investigation coordinated by Kulla regarding specific problems with EOOC's billing practices. (B. Sharp Depo., Ex. 2 to Pl.'s Resp., at 620:12-14.) Kulla, Relator, and others pulled specific examples of problematic Medicare claim forms that had previously been submitted for payment and presented

---

[17] As discussed below, there is a question of fact as to who made the termination decision and when such decision was made.

them to the doctors.[18]  (*Id.* at 620:22-25, 622:17-623:6.)  At the conclusion of the meeting, Relator

warned the doctors that "they didn't want Medicare knocking at their door."  (B. Sharp Depo., Ex.

8 to Def.'s Br. Summ. J., at 649:13-25.)  EOOC contends that the October 2005 meeting is not

sufficient to provide notice that Relator had engaged in any protected activity because the words

"fraud" or "false claims" were not used.  However, it was not part of Relator's duties as Front Desk

Supervisor to investigate fraud or Medicare compliance, and the Court finds it sufficient that Relator

was identifying problems and issuing warnings to doctors who could have been the ultimate

decisionmakers regarding her termination.  *See McBride*, 688 F.3d at 705 (explaining that notice can

be provided by "warning the employer of regulatory noncompliance and false reporting of

information to a government agency"); *Weihua Huang v. Rector and Visitors of Univ. of Va.*, 896

F. Supp. 2d 524, 551-52 (W.D.Va. 2012) (explaining that when an "employee is not specifically

charged with investigatory duties (like, say, an auditor is)," there are no "magic words" and the

employee "need only show that the employer was aware of the employee's investigation") (internal

quotations omitted).

Second, with respect to protected activity occurring after the October meeting, it is

undisputed that Kulla, a member of management and Relator's immediate supervisor, was aware that

Relator was reporting fraudulent claims to Medicare.  Although Relator is not aware if Kulla told

any of the possible decisionmakers about her external whistleblowing (B. Sharp. Depo., Ex. 8 to

Def.'s Br. Summ. J., at 87:17-18), Relator noted in her deposition that EOOC was a relatively small

office where information could easily spread, (*see id.*.at 661:18-19). In addition, Relator informed

---

[18]  Smith, the Medicare Compliance Officer, was not present at this meeting because Kulla did not invite her.  (*Id.* at 156:22-157:1 ("But about this little investigation, that was – [Kulla] wanted to present it to the doctors, because it's a little awkward to go to the compliance officer [Smith] to tell them what they're doing wrong . . . .").)

AdvanceMed that, at some point, Smith "blocked [Relator] out of the computer." (Ex. 130 to Pl.'s Resp.)

Viewing the circumstances as a whole and in favor of Relator, Relator has presented evidence that she: (1) warned certain possible decisonmakers about regulatory noncompliance and problems with specific claims that had been submitted to Medicare for payment, which was outside her job description as Front Desk Supervisor; (2) communicated with Medicare/AdvanceMed for an extended period of time while still working for EOOC, including gathering and copying documents at work in a relatively small office setting; (3) expressly informed Kulla, her direct supervisor and a member of EOOC management, about her external whistleblowing; and (4) was, at some point, blocked out of certain aspects of EOOC's computer system. This is sufficient to create a question of fact on the issue of notice, particularly where questions of fact exist surrounding the circumstances of the termination decision and who the relevant decisionmakers were.

### 3.       Retaliatory Intent

Relator does not have any direct evidence of retaliatory intent, and the Court finds it proper to analyze whether Relator has demonstrated that EOOC's preferred reason for the termination is pretextual, such that she has created a triable question of fact as to retaliatory intent. *See United States ex rel. Erickson v. Uintah Spec. Servs. Dist.*, 268 F. App'x. 714, 717 (10th Cir. 2008) (unpublished) (implicitly approving use of something akin to *McDonnell Douglas* burden shifting in FCA retaliation cases) (affirming grant of summary judgment where the plaintiff "failed to demonstrate that the audit report was not a legitimate, non-discriminatory reason for her termination").[19] Generally, a plaintiff "can meet this burden to show pretext in either of two ways:

_____

[19] The D.C. Circuit and First Circuit have explicitly adopted the *McDonnell Douglas* burden-shifting framework for analysis of retaliatory intent in § 3730(h) retaliation claims at the

(1) by showing that the proffered reason is factually false or (2) by showing that discrimination was a primary factor in the employer's decision, which is often accomplished by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013) (internal alterations and quotations omitted).

Relator was terminated on May 10, 2005.  (*See* Ex. 45 to Def.'s Br. Summ. J.)  EOOC's stated reason for Relator's termination is that her position as Front Desk Supervisor was consolidated with that of the Business Office Manager. (*See* Def.'s Br. Summ. J. at 33 ("[Relator's] position was eliminated.  The business office and the front desk positions were consolidated."); Depo. of R. Smith, Ex. 8 to Pl.'s Resp., at 152:20-153:15 ("We were merging the business office and the front office together and we would be eliminating [Relator's] position."); B. Boone Depo., Ex. 9 to Def.'s Br. Summ. J., at 91:17-92:9 ("Well, we did away with the position.  We combined it with our business office . . . .".)

Relator has presented evidence of weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions in EOOC's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.  First, Relator has presented evidence that she was engaging in protected activity up to and at the time of her termination by continuing her

---

summary judgment stage.  *Schweizer*, 677 F.3d at 1241; *Harrington*, 668 F.3d at 30-31 (adopting approach but explaining that "[t]his burden-shifting framework is a useful screening device in the summary judgment milieu, but courts typically put it aside once the third step is reached").  Although not adopting it by name, other circuits "have adopted or alluded to a similar rule.  *See Scott v. Metro. Health Corp.*, 234 F. App'x. 341, 346 (6th Cir. 2007); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001); *Norbeck v. Basin Elec. Power Coop.*, 215 F.3d 848, 850–51 (8th Cir. 2000).  Thus, there appears to be some consensus that analysis of "pretext" evidence is appropriate in determining whether a plaintiff can reach a jury on the causation element.

investigation and communicating with Medicare, and the Court has found a question of fact as to whether any decisionmakers were on notice of this activity.  Thus, temporal proximity between some of the alleged protected activity and the termination exists.  Second, Relator received a positive performance evaluation in March 2005, two months prior to her termination.  (Depo. of R. Smith, Ex. 8 to Pl.'s Resp., at 150:23-151:14.)  Third, Melissa Turner ("Turner"), the Business Office Manager who would be filling the position once combined with Relator's position, was on maternity leave at the time of Relator's termination.  (Depo. of M. Turner, Ex. 120 to Pl.'s Resp., at 27:3-8.)  The timing of consolidating a position with another, when there will be no person present to fill either role, could be considered implausible.  In addition, Smith never had any discussions with Turner about the consolidation, which seems unlikely since she was the individual who would be filling the "combined" position.  (*Id.* at 27:25-28:6.)

Finally, and most importantly, questions of fact abound regarding the actual circumstances surrounding Relator's termination, and there is evidence that EOOC's preferred reason was never even communicated to Relator at the time of her termination.  The evidence shows that Smith instructed Kulla to terminate Relator.  According to Relator, Kulla gave Relator the following explanation for her termination:

> I – I said, "Well, [Kulla] – I asked [Kulla] what – why.["]  She told me that they want – they're going to fire me.  And I said, "What for?"  And she said, "Dr. Plaster went to [Smith]," and then I guess [Smith] and Dr. Plaster, from my understanding, was [sic] talking to each other and Dr. Emel come [sic] around the corner and he asked what was going on and he said, "I want her out by Friday."

(B. Sharp Depo., Ex. 8 to Def.'s Br. Summ. J., at 70:18-25.)  Kulla did not offer any other explanation for her termination and did not discuss any consolidation of positions.  (*Id.*)  Kulla also

testified that Smith did not mention any consolidation of positions when she instructed Kulla to

terminate Relator.

> Q.  Why did Dr. Emel want Ms. Sharp gone?
> A.  That wasn't explained to me.  That was all that was said.
> Q.  Was any discussion made about consolidating her position with Melissa Turner's position?
> A.  Not at that point.
> Q.  Who made the decision to terminate Ms. Sharp?
> A.  I don't know.
> Q.  How can you not know?
> A.  I was just told they wanted her gone, Dr. Emel wanted her gone.
> Q.  Anyone besides Dr. Emel?
> A.  *That's verbatim what Robin [Smith] told me.*
> Q.  Was there any reason given to you to support Ms. Sharp's termination?
> A.  No.
> Q.  Did you see her do anything that warranted termination?
> A.  No.

(Depo. of S. Kulla, Ex. 94 to Pl.'s Resp., at 128:21-129:14 (emphasis added).)  Smith offered an

entirely different version of events than Kulla:

> Q.  Well, on this specific instance, supposedly, Dr. Plaster was very upset and was raising his voice with you in the hallway.  And Dr. Emel walked up at the end of the conversation.  And from what I understand, Dr. Emel told you at that point that he wanted Brenda Sharp gone by Friday.  Do you recall that happening?
> A.  No.
> Q.  So it just didn't happen?
> A.  I don't recall that at all.  And he never – Dr. Emel never asked me to fire her.
> Q.  According to Susan Kulla, in her affidavit that she submitted in this case, she said that you told her that Dr. Emel wanted Brenda Sharp gone.  Did he ever make that statement to you?
> A.  Not that I remember, no.
> Q.  At some point, Ms. – that week actually, Ms. Sharp was terminated.  Do you remember that?
> A.  I remember discussing more than a week or two ahead of time of her leaving, that we were merging the jobs together.  We were merging the business office and the front office together and we would be eliminating that position.

(Depo. of R. Smith, Ex. 8 to Pl.'s Resp., at 152:20-153:15.)  But even Smith's version of events is not fully supported by EOOC's witnesses.  For example, Dr. Boone, EEOC's Medical Director, could not recall any board meetings or executive meetings where the consolidation of the positions was discussed.  (B. Boone Depo., Ex. 9 to Def.'s Br. Summ. J., at 91:21-24.)

Viewed in total, the above evidence is sufficient to demonstrate that EOOC's preferred reason – consolidation of her position with another – is implausible or unworthy of belief, such that Relator may proceed to trial on the question of retaliatory intent.  *See Harrington*, 668 F.3d at 34 (FCA retaliation claim) (finding that employee had presented evidence of weaknesses in employer's preferred reason relating to a drug test because company was not following own testing protocol and explaining that "irregularities in an employer's dealings with an employee who has fallen out of favor can support a reasonable inference of pretext").

## VI.   Conclusion

Plaintiff Brenda L. Sharp's Motion for Partial Summary Judgment (Doc. 215) is DENIED.

Defendant Eastern Oklahoma Orthopedic Center's Motion for Summary Judgment (Doc. 213) is GRANTED IN PART and DENIED IN PART.  Following is a breakdown of the Court's rulings as to each remaining cause of action:

1.    Violation of 31 U.S.C. § 3729(a)(1):
   (a)    Upcoding preoperative examinations theory: DENIED[20]
   (b)    Miscoding of Dr. Plaster's follow-up visits theory: GRANTED
   (c)    Waiving Medicare co-insurance theory: GRANTED
   (d)    Violations of Medicare Secondary Payer rules: GRANTED

---

[20]  The only false claim that will be considered is that submitted for Relator's aunt.

2.       Violation of 31 U.S.C. § 3729(a)(2):
         (a)     Upcoding preoperative examinations theory: DENIED[21]
         (b)     Miscoding of Dr. Plaster's follow-up visits theory: GRANTED
         (c)     Waiving Medicare co-insurance theory: GRANTED
         (d)     Violations of Medicare Secondary Payer rules: GRANTED

3.       Violation of 31 U.S.C. § 3729(a)(7):
         (a)     Violations of Medicare Secondary Payer Rules: GRANTED

4.       Retaliatory Discharge pursuant to 31 U.S.C. § 3730(h): DENIED


**IT IS SO ORDERED this 29th day of October, 2013.**


**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**

---

[21]  The only false claim that will be considered is that submitted for Relator's aunt.